FILED
United States Court of Appeals
Tenth Circuit

September 11, 2017

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LIYING QIU,

        Petitioner,

v.

JEFFERSON B. SESSIONS III,
United States Attorney General,

        Respondent.

No. 16-9522

**PETITION FOR REVIEW FROM AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS**

Submitted on the briefs:*

Armin A. Skalmowski, Alhambra, California, for Petitioner.

Chad A. Readler, Principal Deputy Assistant Attorney General, Civil Division;
Russell J.E. Verby, Senior Litigation Counsel; and Nancy K. Canter, Trial
Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of
Justice, Washington, D.C., for Respondent.

Before **PHILLIPS**, **McKAY**, and **McHUGH**, Circuit Judges.

**McKAY**, Circuit Judge.

---

    * After examining the briefs and the appellate record, this panel has
determined unanimously to honor the parties' request for a decision on the briefs
without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). This case
is therefore ordered submitted without oral argument.

Petitioner Liying Qiu, a native and citizen of the People's Republic of China, sought asylum and withholding of removal based on her status as a Christian who does not agree with China's state-sanctioned version of Christianity and as a woman who has violated China's one-child policy by having three children. Her application was denied by the immigration court in 2011, and the Board of Immigration Appeals affirmed that decision in March 2013. In December 2015, Petitioner filed a motion to reopen based on the significantly increased persecution of Christians in China in 2014 and 2015. The BIA denied her motion to reopen as untimely. Petitioner now seeks review of that decision.

We review the BIA's denial of Petitioner's motion to reopen for an abuse of discretion. *See Maatougui v. Holder*, 738 F.3d 1230, 1239 (10th Cir. 2013). "The BIA abuses its discretion when its decision provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements." *Id.* (internal quotation marks omitted). Moreover, "[c]ommitting a legal error or making a factual finding that is not supported by substantial record evidence is necessarily an abuse of discretion." *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 n.9 (10th Cir. 2004).

In general, a petitioner may only file a motion to reopen "within 90 days of the date of entry of a final administrative order of removal." 8 U.S.C.

§ 1229a(c)(7)(C)(i). However, "[t]here is no time limit on the filing of a motion to reopen" an asylum case if the motion to reopen is "based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding." *Id.* § 1229a(c)(7)(C)(ii).

To support her motion to reopen, Petitioner submitted numerous articles reporting a significant increase in the persecution of Christians in China in 2014 and 2015. One human rights organization reported in 2015 that there had been "a 300 percent increase in abuse and persecution against Chinese Christians since 2013." (R. at 52.) The report explained that the increase in the number of Christians in China had "triggered a unique sense of crisis" within the Chinese Communist Party, leading to a significantly increased level of persecution by the government. (R. at 52–53.) Another report detailed how the number of people sentenced for activity related to their faith had drastically expanded in 2014 compared to the previous year. (R. at 60.) And an organization that tracks the persecution of Christians worldwide bumped China up its rank of worst-offender lists from 37th in 2014 to 29th in 2015. (R. at 57.)

Even more persuasively, Petitioner also submitted a portion of the 2015 annual report issued by the U.S. Commission on International Religious Freedom—an independent, bipartisan U.S. government entity that monitors

religious freedom violations globally and makes policy recommendations to the President, the Secretary of State, and Congress. In this report, the U.S. Commission explained that in 2014 the Chinese government engaged in "unprecedented violations against" the religious freedoms of Protestant Christians, among others. (R. at 65.) The U.S. Commission explained that "although Christianity is state-sanctioned, the government continues to engage in severe violations of religious freedom against both registered and unregistered Catholics and Protestants." (*Id.*) The U.S. Commission then described an "alarming increase in systematic, egregious, and ongoing abuses" against Christians by the Chinese government. (*Id.*) Indeed, the U.S. Commission noted that "[s]ome have characterized the new wave of persecution against Christians that swept through China in 2014 as the most egregious and persistent since the Cultural Revolution." (*Id.*) Among other things, in what the U.S. Commission characterized as "a striking development," "at least 400 [Christian] churches were torn down or had crosses forcibly removed and/or demolished in 2014, a notable increase over previous years." (*Id.* at 66–67.) The report further noted that the Chinese government specifically targeted "house churches"—unregistered congregations of Christians, like Petitioner and her family, who operate independently from the state-sanctioned Protestant church. Indeed, as part of its "anti-cult" effort, "China's government issued a directive to 'eradicate' unregistered churches over the course of the next decade, resulting in unregistered

church members facing an increased number of arrests, fines, and church closures in 2014." (*Id.* at 68.) And in 2014, the U.S. State Department reported that the Chinese government has been "suspend[ing] or revok[ing] the licenses of lawyers or their firms to stop them from taking sensitive cases, such as defending . . . house-church activists." (R. at 83.)

In addition to all of these reports, Petitioner also submitted evidence that her own mother has been a victim of the Chinese government's increased persecution of Christians and that the government was now intent on punishing Petitioner for her beliefs as well. According to a signed, sworn statement submitted by Petitioner's mother, local government authorities began cracking down on unregistered churches in 2013. After her church was closed, her house became a meeting place, and her house church used Christian materials that were sent to them by Petitioner and her husband. On May 3, 2015, while they were having a gathering at her house, a group of police officers raided her home, took all of the Bibles and other Christian materials, and detained her for ten days, severely beating her on multiple occasions during her detention. The police "told [her] to confess how American reactionary religious organizations instigated [her] daughter and son in law to spread the cult to China." (R. at 34.) The police also told her to tell her daughter and son-in-law to return to China to be sanctioned for this crime. Petitioner's mother was ultimately released from detention on medical parole, after her husband posted a bond and signed a pledge to make sure she did

not engage in more illegal religious activities.

Along with her mother's statement, Petitioner submitted her mother's medical record from May 13, 2015, in which medical professionals reported that they saw and treated multiple bruises on Petitioner's mother's chest, waist, back, and head on that date.

The BIA held that Petitioner had not submitted sufficient evidence to show a change in country conditions, and thus that her motion to reopen was untimely under 8 U.S.C. § 1229a(c)(7)(C). The BIA first held that Petitioner had not submitted sufficient evidence to show that the treatment of Christians in China has worsened since her 2011 immigration hearing. This factual finding is not supported by substantial—or, indeed, any—evidence in the record. The agency provided no rational explanation as to how numerous accounts of a 300 percent increase in the persecution of Christians, "unprecedented violations" of religious freedoms beginning in 2014, and possibly "the most egregious and persistent" wave of persecution against Christians since the Cultural Revolution of 1966–76 was insufficient to show that the treatment of Christians in China had worsened since 2011. Nor is there anything in the record that would contradict Petitioner's extensive evidence of a substantial increase in the government's mistreatment of Christians since 2011. The BIA pointed to the fact that some portions of the State Department's 2014 report include substantially similar language to the 2008 and 2009 reports. However, the State Department's habit of cutting and pasting

portions of its old reports into newer reports does nothing to refute all of the other evidence that the level and intensity of persecution against Christians has increased significantly since 2011. Nor does anything in the State Department report suggest that the U.S. Commission and various human-rights organizations are all reporting false data or drawing false conclusions about the deterioration of the treatment of Christians in China. The BIA thus abused its discretion by holding, completely contrary to all of the evidence, that Petitioner had not shown that the treatment of Christians in China has worsened in recent years.

The BIA also suggested that the substantial increase in the persecution of Christians was simply irrelevant because "[a] review of the record before the Immigration Judge indicated that China has long repressed religious freedom, and that underground or unregistered churches continued to experience varying degrees of official interference, harassment, and repression, including breaking up services, fines, detention, beatings, and torture." (R. at 5.) However, the fact that there was already some level of persecution in China does not prevent Petitioner from showing a change in country conditions due to a significant increase in the level of persecution faced by Christians in her country. To hold otherwise would be to bar reopening for petitioners who file for asylum when they face some, albeit insufficient, risk of persecution in their country, while permitting reopening for petitioners who file for asylum without there being any danger of persecution, then seek reopening after their country fortuitously begins persecuting people

who are in their protected category thereafter. But surely Congress did not intend for 8 U.S.C. § 1229a(c)(7)(C) to protect only petitioners who file frivolous asylum applications under no threat of persecution, while extending no help to petitioners who seek reopening after an existing pattern of persecution becomes dramatically worse. The BIA's reasoning would lead to an absurd result, one we cannot condone.

Instead, we agree with the Second, Seventh, Ninth, and Eleventh Circuits that a significant increase in the level of persecution constitutes a material change in country conditions for purposes of 8 U.S.C. § 1229a(c)(7)(C) and that the BIA abuses its discretion when it fails to assess and consider a petitioner's evidence that the persecution of others in his protected category has substantially worsened since the initial application. *See Paul v. Gonzales*, 444 F.3d 148, 157 (2d Cir. 2006) ("Proof that persecution of Christians in Pakistan has become more common, intense, or far-reaching—*i.e.*, the very proof that petitioner purports to have presented in filing his motion to reopen—would clearly bear on this objective inquiry [into the likelihood of future persecution]. Under the circumstances, the BIA's refusal even to consider such evidence constitutes an abuse of discretion."); *Poradisova v. Gonzales*, 420 F.3d 70, 81–82 (2d Cir. 2005) (holding that the BIA abused its discretion in denying a motion to reopen based on worsened country conditions: evidence that the human-rights situation in Belarus is "in an 'accelerating deterioration'" and "that the situation has

worsened since the Poradisovs' original application" "certainly warranted more than a perfunctory (and clearly inaccurate) mention by the BIA as being 'merely cumulative'"); *Shu Han Liu v. Holder*, 718 F.3d 706, 709, 712–13 (7th Cir. 2013) (holding that a petitioner seeking to file an untimely motion to reopen must meet her burden of "show[ing] that Chinese persecution of Christians (of her type) had worsened," and concluding that the BIA abused its discretion in ignoring evidence that current conditions in China were worse than conditions at the date of the petitioner's final removal hearing); *Chandra v. Holder*, 751 F.3d 1034, 1039 (9th Cir. 2014) ("The BIA abused its discretion when it failed to assess Chandra's evidence that treatment of Christians in Indonesia had deteriorated since his 2002 removal hearing."); *Jiang v. U.S. Attorney Gen.*, 568 F.3d 1252, 1258 (11th Cir. 2009) (holding that the BIA clearly abused its discretion by overlooking or "inexplicably discount[ing]" evidence of "the recent increased enforcement of the one-child policy" in the petitioner's province and hometown).

Finally, the BIA rejected Petitioner's mother's statement regarding her recent religious persecution in Petitioner's hometown as both unreliable and irrelevant. The BIA held that the statement was unreliable for two reasons: (1) it was unsworn, and (2) it was prepared for the purposes of litigation. The first of these reasons is incorrect both as a matter of fact and as a matter of law. Petitioner's mother concluded her statement by expressly swearing to the truth of everything she had stated therein, and thus the BIA's factual finding that the

statement was unsworn is refuted by the record. And even if the BIA were correct in its factual finding, we note that several "[o]ther circuits have admonished the Board for dismissing or according little weight to a statement due to its unsworn nature." *Yu Yun Zhang v. Holder*, 702 F.3d 878, 881 (6th Cir. 2012). There is no statutory support for the BIA's contention that documents at immigration hearings must be sworn, and "numerous courts," "without so much as pausing to note the unsworn nature of a document, . . . have relied on such documents when considering claims of asylum applicants." *Zuh v. Mukasey*, 547 F.3d 504, 509 (4th Cir. 2008). "Moreover," the Fourth Circuit noted in *Zuh*, "it seems untenable to require a sworn statement from a person harassed because of a relationship with an asylum applicant and potentially endangered by helping that applicant." *Id.*; *see also Yu Yun Zhang*, 702 F.3d at 881 ("Given the documented persecution of Christians in China, it seems an arbitrarily high threshold to require that letters attesting to government abuse and admitting membership in a persecuted organization be notarized.").

As for the BIA's second reason for rejecting the statement as unreliable, the fact that the evidence was prepared while litigation was ongoing is all but inevitable in the context of a motion to reopen, and we hold that the BIA may not entirely dismiss an asylum applicant's evidence as unreliable based solely on the timing of its creation. Neither the BIA decision nor the government brief cites to a single statute or circuit court decision to support the idea that the timing of a

statement's creation is a dispositive or even permissible factor in evaluating its reliability in an asylum case. Furthermore, we note that the Sixth Circuit has held that it simply "does not matter that [evidence] may have been written for the express purpose of supporting [a petitioner's] motion to reopen," citing for support to a Ninth Circuit case which held that the BIA may not "denigrate the credibility" of letters written by the petitioner's friends based simply on the inference that her friends "'would tend to write supportive letters.'" *Yu Yun Zhang*, 702 F.3d at 882 (quoting *Zavala-Bonilla v. INS*, 730 F.3d 562, 565 (9th Cir. 1984)). We need not resolve this broader question in the case before us today; even if the timing of a statement's creation might perhaps play some role in determining its credibility and the weight it should be afforded, the BIA cannot entirely dismiss a statement as unreliable based simply on the fact that it was prepared for purposes of litigation. The protections that the asylum statute was intended to provide would be gutted if we permitted the BIA to entirely reject all evidence presented by an asylum applicant that is prepared following the filing of the initial asylum application, and we see neither legal or logical support for such a ruling. We accordingly hold that the BIA abused its discretion in this case by rejecting Petitioner's mother's statement as unreliable based solely on the (erroneous) finding that it was unsworn and on the timing of its creation.

Finally, the BIA dismissed Petitioner's mother's statement as irrelevant because "the respondent's mother is not similarly situated to the respondent,

inasmuch as the incidents giving rise to her purported violations occurred in China, not in the United States." (R. at 4.) This reasoning defies understanding. The heart of the matter is whether Petitioner will be persecuted if she is removed to China—to the town where her mother has allegedly been persecuted for the religious beliefs she shares with Petitioner, and where the local police have allegedly made threatening statements about Petitioner—and it is simply absurd to dismiss her mother's experiences as irrelevant because her mother's experiences occurred in China. Indeed, it is the very fact that her mother's experiences occurred in China that makes them relevant to Petitioner's motion to reopen. The nonsensical nature of the BIA's supposed reasoning on this point is illustrative of the BIA's failure to give fair consideration to any of the arguments in Petitioner's motion to reopen in this case, and it represents the very definition of an abuse of discretion.

The BIA provided no rational, factually supported reason for denying Petitioner's motion to reopen. We conclude that the BIA abused its discretion by denying the motion on factually erroneous, legally frivolous, and logically unsound grounds, and we accordingly remand this case back to the BIA for further consideration. In so doing, we express no opinion as to the ultimate merits of the case.

The petition is **GRANTED** and **REMANDED**.