**UNITED STATES COURT OF APPEALS**

**July 6, 2018**

Elisabeth A. Shumaker
**Clerk of Court**

**TENModel CIRCUIT**

---

A.B.,*

      Petitioner,

v.

JEFFERSON B. SESSIONS III,
United States Attorney General,

      Respondent.

No. 17-9554
(Petition for Review)

---

**ORDER AND JUDGMENT**[**]

---

Before **PHILLIPS**, **McKAY**, and **BALDOCK**, Circuit Judges.

---

We hereby **GRANT** Petitioner's June 25, 2018 motion to expedite this case

and proceed to decide this appeal on the merits.

In 2005, Petitioner, a native and citizen of Bangladesh, applied for asylum,

---

[*] In light of Petitioner's recent deportation to Bangladesh and concerns about his safety there, we use fictitious initials to protect his identity. *See Starkey v. Boulder Cty. Soc. Servs.*, 569 F.3d 1244, 1244 n.* (10th Cir. 2009).

[**] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

After examining the briefs and the appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2)(C); 10th Cir. R. 34.1(G). This case is therefore ordered submitted without oral argument.

withholding of removal, and protection under the Convention Against Torture. He mentioned his status as a religious minority in his application, but he sought relief based mainly on his actual or imputed political opinion. His application was denied. In 2017, Petitioner filed a motion to reopen based on changed country conditions in Bangladesh. Specifically, he contended that treatment of religious minorities in Bangladesh has deteriorated significantly in recent years and that the increased persecution of religious minorities puts him at risk due to his actual or imputed religious beliefs.[1] The Board of Immigration Appeals ("BIA") denied his motion to reopen. Petitioner now seeks review of that decision.

We review the BIA's denial of Petitioner's motion to reopen for an abuse of discretion. *See Maatougui v. Holder*, 738 F.3d 1230, 1239 (10th Cir. 2013). "The BIA abuses its discretion when its decision provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements." *Id.* (internal quotation marks omitted). Moreover, "[c]ommitting a legal error or making a factual finding that is not supported by substantial record evidence is necessarily an abuse of discretion." *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 n.9 (10th Cir. 2004).

The BIA held that Petitioner had not submitted persuasive evidence of

---

[1] Out of concerns for Petitioner's safety, we will not discuss his religious beliefs or identity in this opinion.

-2-

materially changed country conditions in Bangladesh because (1) his own statements were speculative and largely not based on personal knowledge, nor were they sworn to; (2) the background evidence he submitted, "in conjunction with evidence previously in the record, reflects at most a continuation of political violence in Bangladesh and discrimination against religious minorities that existed prior to [Petitioner's 2005] hearing"; and (3) "the voluminous background evidence of Islamist militant violence in Bangladesh, which has been directed at various groups of individuals, including foreigners, does not prima facie demonstrate that [Petitioner] faces an individualized risk of persecution or that he would be subject to a pattern or practice of persecution based on his actual or perceived religious beliefs," since "[e]vidence of violence and civil unrest in Bangladesh does not demonstrate that [Petitioner] has fears that differ from the populace as a whole." (R. at 3.)

We first briefly address the BIA's holding that Petitioner's "statements" were insufficient to sustain his motion to reopen because they were speculative, unsworn to, and largely not based on personal knowledge. These statements consist primarily of Petitioner's own summaries of the documentary evidence he submitted in support of his motion to reopen. Because the documents themselves were submitted into evidence, there was no need for the BIA, and there is no need for us, to determine whether Petitioner's summaries of these documents would be sufficient to sustain his motion to reopen. Rather, we will decide this case on the

basis of the documents themselves.

We turn then to the BIA's holding that the background evidence submitted by Petitioner did not show a material change in country conditions because there has always been political violence and religious discrimination in Bangladesh. This reasoning runs directly contrary to our precedential opinion in *Qiu v. Sessions*, 870 F.3d 1200 (10th Cir. 2017), which was published six weeks before the BIA denied Petitioner's motion to reopen in this case. As we held in *Qiu*, "a significant increase in the level of persecution constitutes a material change in country conditions for purposes of 8 U.S.C. § 1229a(c)(7)(C) and . . . the BIA abuses its discretion when it fails to assess and consider a petitioner's evidence that the persecution of others in his protected category has substantially worsened since the initial application." *Id.* at 1204–05. All of the evidence in this record shows such a significant increase in the level of persecution here.

Petitioner submitted numerous exhibits—newspaper reports, British Parliamentary minutes, government documents, reports of non-governmental organizations, and so forth—which all painted a consistent picture of a significant increase in the persecution of religious minorities in Bangladesh since about 2013. Several newspapers have reported on recent attacks on religious minorities, particularly Hindus and Christians. For instance, in 2014, "Catholic media reported that an armed mob of fifty to sixty men broke into the Catholic convent," where they committed robbery and attempted rape of the nuns. (R. at 757.) This

was reportedly "the first time the nuns have been targeted." (R. at 774.) In 2016, there was "a fivefold surge" of violence from the previous year (R. at 764); in just one incident, "a mob of at least 100 Muslims violently attacked a Hindu village" in "a preplanned effort to push Hindus out of the area" (R. at 735). In that same year, leaders of the Bangladeshi Hindu community "alleged that Hindus are being forced to leave the country," asked the government of India to intervene to put an end to violence against Hindus in Bangladesh, and reported "that the situation in the capital is 'very bad' for the religious minorities," with Hindus stopping previous religious practices and making changes to their attire to conceal their religious identity. (R. at 930.) In 2017, the *Washington Post* reported: "In recent years within Bangladesh . . . , radical Islam has been on the ascent and the Hindu community within the country has borne the brunt of this horrific reality. Hindus make up around 9.5 percent of the Bangladeshi population, but some analysts fear that if the present situation continues, in about 20 years there will be almost no Hindus left." (R. at 424.) And "minorities appear to be losing hope" that the government will do anything to stop the increased violence against them; in 2016, "the general secretary of the Bangladesh Hindu Buddhist Christian Unity Council stat[ed] that 'the sudden acceleration in the murderous attacks shows that the killers are taking advantage of the situation of impunity prevailing in the country.'" (R. at 747 (brackets omitted).)

In 2016, a Member of the British Parliament made remarks in Parliament on

the "deteriorating human rights situation in Bangladesh," and particularly "the persecution of minority religious groups." (R. at 826.) Another Member of Parliament then reported she had conducted an inquiry into this situation, "tak[ing] evidence from both politicians and human rights activities from Bangladesh," and this evidence "confirmed the overall picture that my hon[orable] Friend has painted of escalating violence and increasing concern about the protection offered to religious and political minorities, including by the state authorities" (R. at 832). The second M.P. reported that "[t]he threat against minority groups and foreign nationals has intensified" recently in Bangladesh, with a rise in attacks against religious minorities that "run[s] counter to Bangladeshi traditions of mutual respect and peaceful coexistence." (R. at 837.) Likewise, in 2016 the U.S. Commission on International Religious Freedom—"an independent, bipartisan U.S. government entity that monitors religious freedom violations globally and makes policy recommendations to the President, the Secretary of State, and Congress," *Qiu*, 870 F.3d at 1203—reported: "Historically, Bangladesh, while having some longstanding religious freedom issues, was not afflicted with widespread domestic and transnational extremist and terrorist organizations that targeted religious communities or the government. However, beginning in late 2014, Bangladesh began to experience an increasing number of violent attacks by such groups," which targeted "religious minorities, secular bloggers, intellectual, and foreigners." (R. at 734–35.) Although these

attacks "raised fears among all Bangladesh," the "religious minority communities are especially fearful." (R. at 735.) The United Nations High Commissioner for Human Rights also reportedly expressed concern in 2016 about the increased persecution of religious and other minorities in Bangladesh, stating, "I am very concerned about the dramatic increase in [the] number of brutal murders in Bangladesh that target freethinkers, liberals, religious minorities and LGBT activists." (R. at 952.)

NGOs (non-governmental organizations) have likewise reported that the recent rise of Muslim extremism in Bangladesh has caused a corresponding "increase in violence towards religious minorities." (R. at 780.) In 2016, Minority Rights Group International reported that the rise of extremist organizations in Bangladesh since 2013 "has been accompanied by a spate of brutal attacks particularly targeting Hindus, Christians, Buddhists, Ahmadis, Shi'a Muslims and a variety of other groups, including atheists, LGBT (lesbian, gay, bisexual and transgender) activists and foreigners." (R. at 1156.) This "recent wave of violence" is "undoubtedly connect[ed] . . . with the deep-seated discrimination that religious minorities in Bangladesh have struggled with for decades," but "the difficulties experienced by Bangladesh's religious minorities have intensified" since 2013. (R. at 1157.) "The precarious situation of religious minorities in the country was further undermined by the 2014 elections, the most violent in Bangladesh's history, with religious minorities specifically targeted in

many parts of the country." (R. at 1157.) Another NGO likewise reported that there has been an "outbreak of targeted attacks and communal violence" on religious minorities in Bangladesh since 2013 and that the government has "singularly failed" to protect its religious minorities in the wake of this increased violence. (R. at 1011.) According to a recent Amnesty International press release, "[t]he Hindu community in Bangladesh is at extreme risk" and "appear to be targeted simply for their religion" (R. at 899); another NGO has reported that "[t]he cascade of Hindu persecution seems only to be gaining momentum" (R. at 871). Likewise, another NGO reported in 2017 that the persecution of Christians has risen "sharply" in Bangladesh with the spread of ISIS. (R. at 731.)

The BIA did not cite, and we have not found, any evidence to refute these numerous reports of increased persecution of religious minorities in Bangladesh in the past few years. Although there is evidence that religious minorities in Bangladesh have always been at risk of some level of discrimination and violence, nothing in the record disproves Petitioner's voluminous evidence that the level of violence and persecution has increased substantially since he filed his application for immigration relief in 2005. Thus, the BIA abused its discretion in disregarding all of this evidence of a significant increase in the persecution of religious minorities in Bangladesh. *See Qiu*, 870 F.3d at 1204–05.

The BIA also abused its discretion by holding, without any record evidence for support, that Petitioner has not shown that he faced a higher risk of

persecution than "the populace of the whole" because Islamist militants have targeted "various groups of individuals" and everyone in Bangladesh is at risk of "violence and civil unrest." (R. at 3.) In Bangladesh, religious minorities constitute only a small—and ever-decreasing—part of the population. According to the U.S. Commission, as of 2011, approximately 90 percent of the population in Bangladesh is Sunni Muslim, 9.5 percent is Hindu, and "all other faiths, including Christians and Buddhists, make up the remaining 0.5 percent." (R. at 734.) And all of the evidence in the record indicates that the 10 percent of Bangladeshis who are not Sunni Muslims face a higher risk of violence and persecution than the rest of the population. Whether violence is tied to political movements or not, all of the evidence in the record indicates that religious minorities in Bangladesh are specifically targeted and disproportionately at risk in times of unrest and violence, as has been the case since 2013. (*See, e.g.*, R. at 899 ("The Hindu community in Bangladesh is at extreme risk, in particular at such a tense time in the country. It is shocking that they appear to be targeted simply for their religion. . . . Given the obvious risks the Hindu minority faces in Bangladesh, these attacks were sadly predictable.").) Moreover, although the record indicates that Islamist militants have targeted some individuals besides religious minorities—primarily secular bloggers, atheists, LGBT activists, and foreigners—there is nothing in the record to suggest that these other targeted individuals constitute such a significant portion of the "populace as a whole" that

-9-

anyone could reasonably conclude that religious minorities face no more risk than the rest of the population.

As in *Qiu*, the BIA "provided no rational, factually supported reason for denying Petitioner's motion to reopen." 870 F.3d at 1206. We therefore remand this case back to the BIA for further consideration. In so doing, we express no opinion as to the ultimate merits of the case.

The petition for review is **GRANTED** and **REMANDED**. In light of Petitioner's recent deportation to Bangladesh and his concerns about his safety there, we **GRANT** his motion to seal the case. This opinion shall be publicly filed, but all other documents relating to this case shall be kept under seal. All other pending motions are **DENIED**.

ENTERED FOR THE COURT

Monroe G. McKay
Circuit Judge