FILED
United States Court of Appeals
Tenth Circuit

September 11, 2018

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT
_____

MEHRDAD NOORI HOSSAIN ABADI,

    Petitioner,

v.

JEFFERSON B. SESSIONS, III,
United States Attorney General,

    Respondent.

No. 18-9509
(Petition for Review)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **McKAY** and **MATHESON**, Circuit Judges.
_____

Mr. Mehrdad Noori Hossain Abadi (Mr. Noori), a native and citizen of Iran,

has filed a petition for review of the Board of Immigration Appeals' (BIA) denial of

his motion to reopen his removal proceedings. Exercising jurisdiction under 8 U.S.C.

§ 1252(a)(1), *see Infanzon v. Ashcroft*, 386 F.3d 1359, 1361–62 (10th Cir. 2004), we

deny the petition.

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

## I. BACKGROUND

Mr. Noori attempted to enter the United States in 1993 using a fraudulent visa. He was denied entry and placed in exclusion proceedings. He conceded excludability but applied for asylum and withholding of exclusion and deportation, claiming that if he returned to Iran, he would be persecuted because of his political opinion. In 1994, an administrative law judge denied his application and ordered him excluded, and the BIA denied review. Mr. Noori sought review of the agency's decision by filing a petition for habeas corpus in federal district court. The district court denied his habeas petition but ordered him to file a motion to reopen. Mr. Noori filed the motion to reopen in 1997, seeking asylum based on political opinion. The BIA denied the motion in 1998. We later affirmed the district court's denial of his habeas petition. *See Abadi v. INS*, No. 99-1522, 2000 WL 1158325 (10th Cir. Aug. 16, 2000) (unpublished).

Despite the exclusion order, Mr. Noori remained in the United States. In 2017, he converted from Islam to Christianity and married a woman who also had converted from Islam to Christianity. He then filed a motion to reopen to seek asylum, withholding, and relief under the U.N. Convention Against Torture. He alleged that the persecution of Christian converts in Iran had significantly worsened since the time of his exclusion hearing in 1994. The BIA decided that none of Mr. Noori's evidence showed that there had been a material change in the persecution of Christian converts in Iran since his exclusion proceeding, and that the change in

2

his own circumstances was not a change in country conditions. The BIA therefore denied the motion. Mr. Noori seeks review of that decision.

## II. ANALYSIS

We review the BIA's denial of a motion to reopen for an abuse of discretion. *Qiu v. Sessions*, 870 F.3d 1200, 1202 (10th Cir. 2017). "The BIA abuses its discretion when its decision provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements." *Id.* (internal quotation marks omitted). "[C]ommitting a legal error or making a factual finding that is not supported by substantial record evidence is necessarily an abuse of discretion." *Id.* (internal quotation marks omitted). "[M]otions to reopen immigration cases are plainly disfavored, and [a movant] bears a heavy burden to show the BIA abused its discretion." *Maatougui v. Holder*, 738 F.3d 1230, 1239 (10th Cir. 2013) (brackets and internal quotation marks omitted).

Generally, a petitioner may only file one motion to reopen, 8 U.S.C. § 1229a(c)(7)(A), and it must be filed "within 90 days of the date of entry of a final administrative order of removal," § 1229a(c)(7)(C)(i). The motion to reopen at issue here was Mr. Noori's second, and it was filed some 23 years after his final exclusion order. It was therefore both time- and number-barred. But the time bar does not apply to the filing of a motion to reopen in an asylum or withholding case if the motion is "based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and

3

was not available and would not have been discovered or presented at the previous proceeding." § 1229a(c)(7)(C)(ii). And under 8 C.F.R. § 1003.2(c)(3)(ii), the same showing of changed country conditions skirts the number bar. "[A] significant increase in the level of persecution constitutes a material change in country conditions for purposes of . . . § 1229a(c)(7)(C)," and "the BIA abuses its discretion when it fails to assess and consider a petitioner's evidence that the persecution of others in his protected category has substantially worsened since the initial application." *Qiu*, 870 F.3d at 1204–05. To assess whether there has been a material change in country conditions, the BIA compares the country conditions "that existed at the time of the merits hearing below" with "the evidence of country conditions submitted with the motion [to reopen]." *Matter of S-Y-G-*, 24 I. & N. Dec. 247, 253 (BIA 2007).

Mr. Noori argues that the BIA failed to consider evidence he submitted that in 2017, soon after his conversion and marriage, there began a "new wave" of persecution of Christian converts in Iran, and that his case falls squarely within our decision in *Qiu v. Sessions*. We reject these arguments.

First, the BIA did not fail to consider Mr. Noori's evidence. The BIA specifically acknowledged his argument that conditions had worsened, and it referenced the evidence he submitted in support. Although its discussion of that evidence was concise, it was not insufficient.

Second, Mr. Noori's case is distinguishable from *Qiu*. Unlike in *Qiu*, the BIA did not wholly fail to consider the evidence that persecution had allegedly worsened.

4

Further, there was a much greater volume of evidence in *Qiu*, and that evidence was more probative. One human rights organization specifically identified a 300% increase in the level of persecution of Chinese Christians during the time period relevant to Qiu's motion to reopen, 2013 to 2015. 870 F.3d at 1202. Another report similarly detailed a "drastic[]" increase in the persecution of Chinese Christians from 2013 to 2014. *Id.* Still another report from "an organization that tracks the persecution of Christians worldwide bumped China up its rank of worst-offender lists from 37th in 2014 to 29th in 2015." *Id.* And the annual report for 2015 by the U.S. Commission on International Religious Freedom described "unprecedented violations," "an alarming increase in systematic, egregious, and ongoing abuses," and the "striking development" of the destruction of more than 400 Christian churches in 2014, "a notable increase over previous years." *Id.* at 1202–03 (internal quotation marks omitted).

Further, and of particular relevance to Mr. Noori's argument, in *Qiu*, the U.S. Commission noted that "some have characterized the *new wave* of persecution against Christians that swept through China in 2014 as the most egregious and persistent since the Cultural Revolution." *Id.* at 1203 (brackets and internal quotation marks omitted). Mr. Noori notes that one piece of his evidence, a Fox News article from March 2017, also uses the term "new wave" as part of its title: "Iran arrests two Catholics in new wave of brutality against Christians." R., Vol. 1 at 131. The article describes the arrests of two recent converts from Islam to Christianity as a "draconian raid" and "part of a brutal crackdown on Catholicism" in one Iranian province. *Id.*

5

The article also reports that Iran had "ramped up its persecution of Christians in 2016," arresting "at least 79 Iranian Christians." *Id.* at 132. But using the same descriptive phrase, "new wave," does not put Mr. Noori's case squarely within *Qiu*. In *Qiu*, as discussed, there was a host of other, uncontroverted evidence that the persecution of Christians had significantly increased during the time period relevant to the reopening inquiry.

Similar supporting evidence is lacking here. The only evidence Mr. Noori submitted of what conditions were like when his prior exclusion proceedings ended was an excerpt from a book authored by Ayatollah Khomeini in 1984 sanctioning the execution of male apostates—those who were born of at least one Moslem parent, "embraced Islam following puberty[,] and then left Islam." *Id.* at 121–22. Lacking any other new evidence regarding earlier conditions, the BIA *sua sponte* reviewed the administrative record associated with Mr. Noori's prior proceedings, including his 1997 motion to reopen. That evidence shows that between 1994 and 1996, a number of Christian churches were closed, and converts from Islam to Christianity were arrested, harassed, oppressed, discriminated against, verbally or physically abused or tortured, or, in several cases involving Christian leaders, assassinated or executed. *See id.* at 256, 260, 271, 293, 312, 313, 317, 344–46, 369; *id.*, Vol. 2 at 404, 409, 410, 430. There is some discussion of several specific instances involving imprisonment, torture, and execution, and a few indications of the scale on which these things occurred: "[I]n 1994, . . . the government mounted a fierce campaign against the small Christian minority," "scores of young Christians — many of them

6

converts from Islam — have been imprisoned and tortured," and there was an "increased harassment of Christians in Iran." *Id.*, Vol. 1 at 345. In 1996, the "[o]ppression of evangelical Christians increased." *Id.* at 256.

Neither Fox News's "new wave" article nor any of Mr. Noori's other evidence of current conditions permits a determination that the persecution of Christian converts in Iran has significantly increased or substantially worsened since the time of Mr. Noori's exclusion proceedings. A July 2017 press release from the Center for Human Rights in Iran characterized as a "[s]entencing [s]pree" the fact that one judge in Tehran gave 10- or 15-year prison sentences to 11 Christian converts, allegedly on "trumped up charges" or in "a trial completely lacking due process." *Id.* at 124–125. Also in July 2017, a Farsi Christian News Network article, apparently discussing the same 11 convictions (four of which were for promoting "house churches" and "Zionist Christianity") and one other conviction, opined that "prison gates are opening wider for persecuted Christians in Iran with 12 more receiving prison sentences last month." *Id.* at 128 (internal quotation marks omitted). The article quoted a human rights group representative as saying "the Iranian government is fearful of the growth of Christianity inside Iran," and a representative of a Christian group as saying the convictions were "on spurious charges" and "clearly part of an intensified campaign of judicial harassment aimed at intimidating members of minority faiths." *Id.* at 128 (internal quotation marks omitted). A late 2016 article from thedailybeast.com discusses two other individual cases of convert incarceration and indicates there are about 90 Christians imprisoned in Iran, ostensibly because of

7

their religious beliefs, and that many converts practice at house churches. *Id.* at 137–38. These reports do not show a significant increase in the oppression of Christian converts from the "fierce campaign" and "scores" of imprisoned and tortured Christians mentioned in the evidence from Mr. Noori's prior proceedings.

A March 2017 World News Group article titled "Christian sites destroyed in Iran" cites an Iranian news organization, Mohabat News, as reporting vandalism at a Christian cemetery in 2012, "more recent property damage at an Armenian church," "the destruction of [at] least two churches," and that "[m]any of the roughly 500 registered church buildings are abandoned or on the verge of destruction." *Id.* at 140 (internal quotation marks omitted). This report of property damage is not meaningfully different than the closing of several churches referred to in the record evidence from Mr. Noori's prior proceedings, and the only explanation of why the 500 registered church buildings have been abandoned or teeter on the brink of destruction is that the Iranian government has allowed "historic Christian sites to fall into disrepair." *Id.*

The World News Group article also states that an appeals court had recently upheld the Iranian government's confiscation of a Christian property called Sharon Gardens, but then quotes a spokesman from the International Campaign for Human Rights in Iran as saying that "Christians out of fear kept quiet about a lot of church property confiscations in the past," *id.* (internal quotation marks omitted), which implies that the confiscation of Sharon Gardens was another instance of a long-standing issue, not a manifestation of a worsened situation. The article closes

8

by acknowledging the existence of underground Christian evangelical churches and noting that an organization called "Open Doors ranked Iran eighth on its most recent World Watch list of nations that persecute Christians, up one spot from last year." *Id.* at 141. But the fact that Iran ranks eighth on one list of nations that persecute Christians is, standing by itself, not germane to whether conditions have substantially worsened.

Mr. Noori's final pieces of evidence are the U.S. Department of State's Iran 2016 Human Rights Practices and the State Department's 2016 travel warning for Iran, but like the news articles Mr. Noori submitted, they do not show the requisite change in country conditions. Mr. Noori admits he provided the State Department report only for its statement that there are "'harsh and life-threatening conditions in [Iran's] detention facilities.'" Pet'r's Opening Br. at 19 (quoting R., Vol. 1 at 143). But nothing in the report or any of the other record evidence indicates that such conditions did not exist at the time of Mr. Noori's prior proceedings. And only two other parts of the State Department report bear on religious persecution. The first is the undisputed fact that Iranian "law provides the death penalty in cases of . . . apostasy." R., Vol. 1 at 144. The second is that "[t]he human rights NGO United for Iran estimates there are 905 prisoners of conscience in Iran, including those jailed for their religious beliefs." *Id.* at 154. This statement, however, is too vague with respect to the relevant inquiry—the number of Christian converts imprisoned because of their apostasy—to be of any help in determining whether the persecution of Christian converts in Iran in 2017 was substantially worse than it was during

9

Mr. Noori's prior proceedings.[1] The travel warning simply says that "[t]he Iranian government continues to repress some minority religious and ethnic groups, including Christians." *Id.* at 192.

We do agree with Mr. Noori that the BIA misunderstood the significance of an observation in the Human Rights Practices report that the Iranian government "reserves five seats in parliament for members of recognized minority religious groups," and that three of those seats were filled by Christians. *Id.* at 171. Iran recognizes Christianity, *id.* at 256, but it does not recognize apostates, so the fact that the three seats were filled by Christians does not mean those Christians were converts from Islam and thus perhaps indicating that conditions have not substantially worsened. But because the BIA acknowledged Iran's rejection of apostates earlier in its decision, and none of the other record evidence suffices to meet Mr. Noori's heavy burden to obtain reopening, the BIA's partial reliance on the presence of three Christians in parliament was at most harmless error.

## III. CONCLUSION

We conclude that the BIA did not abuse its discretion in determining that, on this record, the treatment of Christian converts in Iran in 2017 was not substantially

---

[1] The section of the 2016 Human Rights Practices report titled "Freedom of Religion" contains no discussion but instead directs the reader to the State Department's "*International Religious Freedom Report*." R., Vol. 1 at 166. That report is not part of the record.

worse than the treatment of such converts at the time of Mr. Noori's prior

proceedings. The petition for review is therefore denied.[2]

Entered for the Court


Monroe G. McKay
Circuit Judge

---

[2] Mr. Noori alleges that in denying his motion to reopen, the BIA treated him differently than a Jewish woman from the Ukraine, whose removal proceedings the BIA reopened due to changed country conditions there. He claims that because his case is even stronger than that of the Ukrainian woman (who was also represented by Mr. Noori's counsel), the only rational explanation for this disparity is the current administration's prejudice against Islam and Iran. In light of our conclusion that the BIA did not abuse its discretion in determining, on this record, that the treatment of Christian converts in Iran in 2017 was not substantially worse than its treatment of those converts during Mr. Noori's prior proceedings, we reject this allegation as wholly speculative. Moreover, there is a complete lack of evidence to support the claim that Mr. Noori's case is stronger than the Ukrainian woman's case.