FILED
**United States Court of Appeals**
**Tenth Circuit**

**August 17, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

MAYRA VERONICA ESTRADA-CARDONA,

     Petitioner,

v.

MERRICK B. GARLAND, United States Attorney General,

     Respondent.

No. 21-9562

_____

**Petition for Review of an Order from the**
**Board of Immigration Appeals**

_____

Jennifer M. Smith of Jennifer Smith Law Office, Glenwood Spring, Colorado (Mark R. Barr of Lichter Immigration, Denver, Colorado, with her on the briefs), for Petitioner.

Keith McManus, Office of Immigration Litigation (Brian Boynton, Acting Assistant Attorney General, Civil Division; Jessica E. Burns, Senior Litigation Counsel, Office of Immigration Litigation; Spencer S. Shucard, Trial Attorney, Office of Immigration Litigation, on the brief), United States Department of Justice, Washington, D.C., for Respondent.

_____

Before **HARTZ**, **BALDOCK**, and **McHUGH**, Circuit Judges.

_____

**BALDOCK**, Circuit Judge.

_____

The Attorney General may allow otherwise-removable aliens to remain in the country if, among other things, they have accrued 10 years of continuous physical presence in the United States. We call this form of discretionary relief "cancellation of removal." Under the statutory "stop-time rule," the period of continuous physical presence ends (A) when the alien is served with a notice to appear, or (B) when the alien has committed certain criminal offenses. 8 U.S.C. § 1229b(d)(1). Nothing more, nothing less. In the latest installment of "What Triggers the Stop-Time Rule?" the Government asks us to hold that the issuance of a final order of removal is a third, extra-statutory event sufficient to stop the clock. The plain language of the statute supports no such conclusion. Declining to read ambiguity into a statute where none exists, we hold a final order of removal does not stop the accrual of continuous physical presence.

## I.

In 2002, Petitioner Mayra V. Estrada-Cardona entered the United States on a tourist visa which she subsequently overstayed. She resided in the United States with her two United States citizen children: A.E. and L.E. A.E. suffers from mental and physical disabilities, some of which are likely to be lifelong. While in the United States, Petitioner played a key role in ensuring A.E. received physical therapy and special education support—both vital to A.E.'s wellbeing and continued progress.

All was quiet until May 29, 2009, when police arrested Petitioner for driving without a license. She pleaded guilty and paid the associated fines. As a result of the traffic violation, Immigration and Customs Enforcement ("ICE") detained Petitioner

and began removal proceedings.   Pursuant to the then-prevailing practice, the Government issued Petitioner a notice to appear ordering her to appear before an immigration judge on a date and time "to be set."  Five months later, the Government sent Petitioner a notice of hearing setting the date and time of her hearing.

At the hearing, Petitioner appeared unrepresented and conceded the charge contained in the notice to appear—rendering her removable.  At the time, Petitioner was in the country for at most seven years, making her statutorily ineligible for any discretionary relief from removal.  The immigration judge therefore ordered Petitioner to voluntarily depart the United States.

A month later, Petitioner filed a flurry of motions.  One of these motions, a motion to stay the voluntary departure pending the resolution of her other motions, effectively converted her voluntary departure into a removal.  *See* 8 C.F.R. § 1240.26(b)(3)(iii), (e)(1).  Petitioner's other motions were denied by the BIA on January 23, 2013.  Every year—from 2013 to 2017—Petitioner requested a stay of removal, and every year ICE approved her request.  That is, until ICE denied her most recent request on December 28, 2017.  ICE did not take any immediate action to remove Petitioner from the United States, only requiring her to attend regular check-ins at the local ICE office.  ICE finally detained Petitioner and initiated removal on September 30, 2020.

In the period between the denial of Petitioner's request to stay removal and her removal, Petitioner filed two post-proceeding motions which set up the issue in this appeal.  In what the parties call Motion II, Petitioner asked the BIA to reopen the

3

removal proceedings pursuant to the then-recent Supreme Court case *Pereira v. Sessions*, 138 S. Ct. 2105 (2018). Based on *Pereira*, Petitioner continued to accrue presence for cancellation of removal—a form of discretionary relief the Attorney General can grant otherwise-removable aliens—even after receiving the notice to appear because it was not "a notice to appear under section 1229(a)." 8 U.S.C. § 1229b(d)(1)(A). The notice to appear failed to specify the "time and place at which the proceedings will be held." *Id.* § 1229(a)(1)(G)(i). Because the notice to appear did not stop the clock, Petitioner insisted that she had the requisite presence to be eligible for cancellation of removal because she had been in the country for 16 years. *See* § 1229b(b)(1)(A) (requiring 10 years of continuous physical presence in United States to be eligible for cancellation of removal). The BIA, recognizing the force of Petitioner's argument, found a new reason to cut Petitioner's presence short: the Government's subsequent notice of hearing detailing the time and place of the hearing "perfected" the initially defective notice to appear triggering the stop-time rule. *See Mendoza-Hernandez*, 27 I. & N. Dec. 520, 529 (B.I.A. 2019). Because the notice of hearing "perfected" the notice to appear on October 28, 2009—seven years after Petitioner entered the United States—she was not, according to the BIA, eligible for cancellation of removal.

The BIA's notice-by-installment theory was short-lived. In 2020, we held "the stop-time rule is not triggered by the combination of an incomplete notice to appear and a notice of hearing." *Banuelos-Galviz v. Barr*, 953 F.3d 1176, 1184 (10th Cir. 2020). And in 2021, the Supreme Court agreed. *Niz-Chavez v. Garland*, 141 S. Ct.

4

1474 (2021).  After our decision in *Banuelos-Galviz*, Petitioner filed another post-proceeding motion—which the parties call Motion III—arguing once again that the BIA should reopen her proceedings given her apparent eligibility for cancellation of removal.[1]  Dusting off its old precedent, the BIA invoked the so-called "final-order rule" to cut Petitioner's presence short.  The stop-time rule's predecessor, the final-order rule cuts off presence when a final order of removal is issued.  *See Garcia*, 24 I. & N. Dec. 179, 181 (B.I.A. 2007).  Applying this rule, the BIA held Petitioner was not eligible for cancellation of removal because the immigration judge issued the order to voluntarily depart, which qualifies as a final order of removal, when Petitioner had accrued, at most, eight years of physical presence.  Additionally, because Motion III was both time- and number-barred, 8 C.F.R. § 1003.2(c)(2) (limiting aliens to one motion to reopen filed no later than 90 days after the final administrative decision), the BIA concluded by declining to exercise sua sponte authority to reopen the proceedings and holding there were no extraordinary circumstances which would warrant equitable tolling.  This petition for review followed.

## II.

We have statutory jurisdiction to review the BIA's denial of a motion to reopen under 8 U.S.C. § 1252(a)(1) and 28 U.S.C. § 2342.  *Mata v. Lynch*, 576 U.S. 143, 147 (2015).  Our statutory jurisdiction, however, is limited to reviewing constitutional or

---

[1] Motion III asked the BIA to "reconsider and reopen the proceedings." Throughout the opinion, we refer to Motion III as a motion to reopen but it might also be properly characterized as a motion to reconsider.

legal questions. *See* 8 U.S.C. § 1252(a)(2)(B), (D); *Patel v. Garland*, 142 S. Ct. 1614, 1627 (2022).

We also have constitutional jurisdiction, but it demands a more detailed explanation. Article III limits the federal courts' jurisdiction to certain "Cases" and "Controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). One element of the case-or-controversy requirement is that plaintiffs must establish they have standing to sue. *Id.* "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Id.* at 409 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dall.*, 493 U.S. 215, 231 (1990) (cleaned up) (quotation omitted). Because of the statutory language at issue and Petitioner's removal to Mexico, it has become necessary to assure ourselves that Petitioner has standing—specifically, we must decide whether a determination in Petitioner's favor would likely redress her injury.[2] *Lujan*, 504 U.S. at 561; *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

---

[2] As best we understand it, Petitioner was removed to Mexico despite the Government's repeated assertion that she was removed to Honduras.

The cancellation of removal statute states: "The Attorney General may cancel removal of, . . . an alien who is inadmissible or deportable from the United States if the alien has been physically present in the United States for a continuous period of not less than 10 years *immediately preceding the date of such application*."  8 U.S.C. § 1229b(b)(1) (emphasis added).  If Petitioner was not removed and still in the United States, a determination in her favor would clearly enable her to return to the BIA and ask for reopening so that she can make an application for cancellation of removal.  *See id.*  But Petitioner's removal complicates this matter.  If we decide in Petitioner's favor and remand to the BIA, the statutory language suggests she cannot meet the eligibility requirements for cancellation of removal because any application filed after the BIA's reopening would not be immediately preceded by 10 years of continuous presence "in the United States."  *Id.*  In this situation, any determination in favor of Petitioner would be unlikely to redress her injury.

At oral argument, Petitioner explained that if she successfully reopened her proceedings, she could ask the BIA to treat an application for cancellation of removal as if it were filed before Petitioner was removed.  Oral Argument 4:20–5:24.  *See generally Edwards v. INS*, 393 F.3d 299, 308–09 (2d Cir. 2004) (explaining the role of *nunc pro tunc* (literally "now for then") in the field of immigration law).  We have no occasion to consider the merit or appropriateness of such an argument, but we hold it is sufficient to establish Article III standing.  If we decide this case in Petitioner's favor and remand, she can ask the BIA to treat any post-reopening application for cancellation of removal as if it were immediately preceded by 10 years of continuous

7

physical presence in the United States—meaning a favorable decision by this Court could redress her injury. Petitioner has Article III standing.

The same line of reasoning leads us to conclude that Petitioner's removal does not moot this case. Petitioner can benefit from relief in this Court by pursuing her application for cancellation of removal on remand. *Lopez v. Gonzales*, 549 U.S. 47, 52 n.2 (2006). Having assured ourselves that Petitioner has standing, and her claim is not moot, we proceed to the merits.

## III.

We review the BIA's denial of a motion to reopen for an abuse of discretion. *Berdiev v. Garland*, 13 F.4th 1125, 1130 (10th Cir. 2021). "The BIA abuses its discretion when its decision provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements." *Qiu v. Sessions*, 870 F.3d 1200, 1202 (10th Cir. 2017) (quoting *Maatougui v. Holder*, 738 F.3d 1230, 1239 (10th Cir. 2013)). If the BIA commits a legal error—a determination we make de novo—it necessarily follows that the BIA abused its discretion. *See id.*; *Ferry v. Gonzales*, 457 F.3d 1117, 1126 (10th Cir. 2006).

## IV.

This petition for review represents the latest chapter in the Government's ongoing efforts to dig itself out of a hole it placed itself in. The Attorney General may allow otherwise-removable aliens to remain in the country if, among other things, they have accrued 10 years of continuous physical presence in the United States. 8 U.S.C.

§ 1229b(b)(1)(A). Continuous physical presence accrues under the stop-time rule until (A) an "alien is served a notice to appear under section 1229(a)," or (B) the alien commits certain criminal offenses. *Id.* § 1229b(d)(1). This seemingly simple rule "has generated outsized controversy," *Niz-Chavez*, 141 S. Ct. at 1479, and all of it stems from the Government's failure to serve—as required by the statute—"a notice to appear under section 1229(a)." § 1229b(d)(1).

For years, if not decades, the Government sent aliens "notices to appear" which failed to include all the information required by § 1229(a)—like the "time and place at which the proceedings will be held." 8 U.S.C. § 1229(a)(1)(G)(i). For countless aliens, the only obstacle to being eligible for cancellation of removal was the Government's position that a time-and-place-to-be-set notice to appear still triggers the stop-time rule. In *Pereira*, the Supreme Court rejected the Government's atextual interpretation and held a "putative notice to appear that fails to designate the specific time or place of the [alien]'s removal proceedings is not a 'notice to appear under section 1229(a),' and so does not trigger the stop-time rule." 138 S. Ct. at 2113–14. In one fell swoop, the Supreme Court cleared the way for many aliens, like Petitioner, to seek cancellation of removal.

But the Government quickly erected a new hurdle. The Government's new position was that it could trigger the stop-time rule by serving a second document, a notice of hearing, detailing the time and place of the proceedings. In its view, the notice of hearing cured the initially defective notice to appear. Criticizing the Government for continuing "down the same old path," the Supreme Court once again

9

rejected the Government's atextual interpretation. *Niz-Chavez*, 141 S. Ct. at 1479. The stop-time rule requires service of "a" notice to appear, and "'a' notice would seem to suggest just that: 'a' single document containing the required information, not a mishmash of pieces with some assembly required." *Id.* at 1480.

This brings us to the present appeal, where the Government's flavor-of-the-day is the final-order rule. The Government argues the final-order rule—which ends continuous physical presence when the immigration judge issues a final order of removal—operates in cases where the stop-time rule was never triggered. The narrow issue before us is whether the text of the stop-time rule can support such a reading. Our analysis proceeds in two steps. First, considering "all the textual and structural clues" bearing on the meaning of the statutory stop-time rule, *id.*, we conclude the stop-time rule replaced the final-order rule. Second, we remand for the BIA to reconsider whether to reopen sua sponte or apply equitable tolling.

### A.

Congress enacted the stop-time rule as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009–546. Before the stop-time rule, the final-order rule controlled when the period of continuous physical presence was deemed to end. *See Garcia*, 24 I. & N. Dec. at 181. Even though the statutory stop-time rule makes no mention of the final-order rule, the Government asserts we must give *Chevron* deference to the BIA's interpretation that the final-order rule not only survived the enactment of the stop-time rule but operates in cancellation cases where the stop-time rule is never triggered.

10

The Government skips a step: we cannot defer to an agency's interpretation of a statute until we exhaust all the textual and structural clues bearing on the meaning of that statute and conclude Congress has not addressed the question at issue. *Niz-Chavez*, 141 S. Ct. at 1480; *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 843 n.9 (1984). If, after employing traditional tools of statutory construction, we resolve the interpretive question put before us, "our sole function is to apply the law as we find it, not defer to some conflicting reading the government might advance." *Niz-Chavez*, 141 S. Ct. at 1480 (cleaned up). "[A]n agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear." *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 229 (1994).

We need not go further than the statute's text to conclude the stop-time rule supplanted, rather than supplemented, the final-order rule. The stop-time rule reads:

> For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end (A) . . ., when the alien is served a notice to appear under section 1229(a) of this title, or (B) when the alien has committed [certain removable offenses], whichever is earliest.

8 U.S.C. § 1229b(d)(1). Based on this language, "time will stop accruing when the alien was (1) served with a notice to appear, or (2) when the alien committed certain removable offenses." *Torres de la Cruz v. Maurer*, 483 F.3d 1013, 1020 (10th Cir. 2007); *see Quebrado Cantor v. Garland*, 17 F.4th 869, 874 (9th Cir. 2021). The final-order rule is absent.

"Straining to inject ambiguity into the statute," *Pereira*, 138 S. Ct. at 2116, the Government asserts that Congress was "silent" on the question of whether the final-

11

order rule survived the enactment of the stop-time rule and operates in cancellation cases where the stop-time rule is not triggered. Congress was "silent" in the sense it did not say: "The final-order rule no longer ends the period of continuous physical presence." But Congress can specifically address an issue without speaking explicitly. For example, even though Congress never explicitly told the FDA it did not have authority to regulate nicotine under the Food, Drug, and Cosmetic Act, the Supreme Court nevertheless held Congress directly spoke to that issue and "precluded the FDA's jurisdiction to regulate tobacco products." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000).

Three clauses in the stop-time rule require us to hold Congress replaced, rather than supplemented, the final-order rule. First, the statute's use of the word *any* means the stop-time rule controls the calculation of *every* period of continuous physical presence. The statute says "*any* period of . . . continuous physical presence in the United States shall be deemed to end" when the stop-time rule applies. 8 U.S.C. § 1229b(d)(1) (emphasis added). When used in this context, *any* means *every*. Webster's Third New International Dictionary 97 (Philip Babcock Gove ed., 1961) (defining *any* as "one, no matter what one: every"); 1 The Oxford English Dictionary 539 (J. A. Simpson & E. S. C. Weiner eds., 2d ed. 1989) ("In affirmative sentences it [i.e., *any*] asserts concerning a being or thing of the sort named, without limitation as to which, and thus constructively of *every* one of them, since every one may in turn be taken as a representative."); *see Novartis Pharma AG v. Incyte Corp.*, 520 F. Supp. 3d 514, 527–28 (S.D.N.Y. 2021). Thus, the statute says *every* period of continuous

physical presence shall be deemed to end when the stop-time rule applies, leaving *no* periods of continuous physical presence to be controlled by the final-order rule. *Any* can sometimes mean *some*, but as it is used in § 1229b(d)(1) the only acceptable reading is *any* means *every*. We must therefore give *any* its operative meaning and hold the stop-time rule controls *every* calculation of continuous physical presence. *See United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used.").

Second, the stop-time rule provides an exhaustive list of events sufficient to end the period of continuous physical presence and the issuance of a final order of removal is not one of them. The statute states that every period of continuous physical presence shall end "(A) . . ., when the alien is served a notice to appear under section 1229(a) of this title, *or* (B) when the alien has committed [certain removeable offenses], *whichever is earliest*." § 1229b(d)(1) (emphasis added). When unaccompanied by words signifying enlargement—like *including*—the use of the word *or* creates an exhaustive list of events sufficient to stop the clock. *See* Webster's Third New International Dictionary, *supra*, at 1585 (defining *or* as a "choice between alternative things"); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 132 (2012) ("[T]he word *include* does not ordinarily introduce an exhaustive list."). This means an unenumerated event—like the issuance of a final order of removal—cannot stop the clock. *See United States v. Giordano*, 416 U.S. 505, 513 (1974) (holding an executive assistant does not have the power to authorize a wiretap application under a statute granting that power to the "Attorney General, or any

Assistant Attorney General specifically designated"). This conclusion is only bolstered by the statute's inclusion of the phrase *whichever is earliest*.

The Government would effectively have us revise the statute so that there is a third trigger: (C) the issuance of a final order of removal. In the Government's view, we must adopt such a reading to carry out the spirit, but not the text, of the law. When adopting the stop-time rule, the Government continues, Congress could never have contemplated a situation like Petitioner's where aliens were in the throes of removal proceedings—or even already ordered removed—but were still accruing presence. "The question, however, is not what Congress 'would have wanted' but what Congress enacted." *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 618 (1992). Congress knew about the final-order rule and could have included it in the statute as a third basis for stopping the clock. *See* H.R. Rep. No. 104-469, at 122 (1996) (explaining, in the context of justifying the proposed stop-time rule, that aliens "often abused" the final-order rule by "seeking to delay proceedings" until the requisite time had accrued). Congress' failure to do so does not "justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554 (1925). "[I]f the Congress intended to provide additional exceptions, it would have done so in clear language." *Petteys v. Butler*, 367 F.2d 528, 538 (8th Cir. 1966) (Blackmun, J., dissenting).

Third, the statute's mandatory language leads to the inescapable conclusion that the final-order rule cannot end the period of continuous physical presence. The statute commands that any period of continuous physical presence "*shall* be deemed to end" when the alien is served a notice to appear or commits a qualifying crime. 8 U.S.C.

§ 1229b(d)(1) (emphasis added). By using the term *shall*, instead of *may*, Congress made the issuance of a notice to appear or commission of a qualifying crime a prerequisite for stopping the clock. *See Kingdom Techs., Inc. v. United States*, 579 U.S. 162, 171–72 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."). An extra-statutory event like the issuance of a final order of removal is insufficient to stop the clock.

Putting these clauses together, the stop-time rule applies to *every* calculation of continuous physical presence and *requires* the occurrence of one of only two possible events to stop the clock. We cannot say Congress was "silent" or "ambiguous" about the question of whether a third, extra-statutory event was sufficient to stop the clock— an ordinary reader would understand it is not. *Chevron*, 467 U.S. at 843; *Niz-Chavez*, 141 S. Ct. at 1480. "Congress considered which events ought to 'stop the clock' on a nonpermanent resident's period of continuous physical presence and settled, in its legislative judgment, on only two." *Quebrado Cantor*, 17 F.4th at 874.

The Government can only fall back to legislative history and policy arguments to support its atextual reading of the stop-time rule. Correctly noting the stop-time rule was passed to remove the alien's incentive to delay removal proceedings by moving the stop-time trigger from the end of the proceedings to the beginning, the Government argues that our reading of the statute is wrong because it "thwarts the purpose of IIRIRA by not only incentivizing delay but exacerbating the issue, encouraging noncitizens with final, active removal orders to remain in the United States as long as possible." Br. for Resp't 18–19 (cleaned up). But this perverse incentive is entirely

15

of the Government's own making.    The Government could have stopped the accumulation of continuous physical presence by issuing a proper notice to appear, *see Quebrado Cantor*, 17 F.4th at 874, or by executing the immigration judge's order and removing Petitioner, *see* 8 U.S.C. § 1229b(b)(1)(A) (requiring 10 years of continuous physical presence "in the United States").    We do not have the power to depart from the statute's clear text to cure the ills of government inaction.    *See Niz-Chavez*, 141 S. Ct. at 1485; *Pereira*, 138 S. Ct. at 2118.

After years of statutory short-circuiting, the Government finds itself in the uncomfortable position of being wrong.    To stop the clock, all the Government had to do was serve an alien with a statutorily compliant notice to appear.    8 U.S.C. § 1229b(d)(1)(A).    It did not and now countless aliens might be eligible for cancellation of removal.    Instead of accepting its mistake or focusing its energies on Congress (who might be able to bail it out), the Government has chosen to "continue down the same old path," *Niz-Chavez*, 141 S. Ct. at 1479, asking us to ignore the clear statutory text in favor of its preferred interpretation.    "What the government asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope.    To supply omissions transcends the judicial function."    *Iselin v. United States*, 270 U.S. 245, 251 (1926).    "An omission at the time of enactment, whether careless or calculated, cannot be judicially supplied however much later wisdom may recommend the inclusion."    Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 534 (1947).

16

"At the end of the day, given the clarity of the plain language, we apply the statute as written" and hold a final order of removal is insufficient to stop the clock. *Pereira*, 138 S. Ct. at 2119–20 (quotation omitted); *see Quebrado Cantor*, 17 F.4th at 874. Because Congress unambiguously replaced the final-order rule with the stop-time rule, the BIA's application of the final-order rule was legal error. Petitioner continued to accrue continuous physical presence after the immigration judge issued the order to voluntarily depart.

**B.**

Having concluded the BIA's decision rests on legal error, the remaining question is whether to remand. The BIA relied on two independent and sufficient grounds to deny Petitioner's motion to reopen: (1) Petitioner's motion was untimely and the BIA declined to reopen the proceedings sua sponte or equitably toll the deadline; and (2) even if Petitioner's motion was timely, the final-order rule prevented her from satisfying the presence requirement for cancellation of removal. Even after resolving the second issue in favor of Petitioner, we can only remand if there is reason to believe the erroneous final-order rule analysis may have infected the BIA's decision to not reopen the proceedings sua sponte, *Berdiev*, 13 F.4th at 1130, or if the BIA's equitable tolling analysis is "devoid of any reasoning, or contains only summary or conclusory statements." *Qiu*, 870 F.3d at 1202 (quoting *Maatougui*, 738 F.3d at 1239). We take each in turn and conclude remand is appropriate.

In the exercise of its discretion, the BIA may overlook the untimeliness of a motion to reopen by reopening the proceedings sua sponte. We generally lack

jurisdiction to review the BIA's refusal to reopen sua sponte, "because there are no standards by which to judge the agency's exercise of discretion." *Berdiev*, 13 F.4th at 1130 (quoting *Jimenez v. Sessions*, 893 F.3d 704, 708–09 (10th Cir. 2018)). But where the BIA "may have declined to exercise its sua sponte authority because it misperceived the legal background and thought, incorrectly, that a reopening would necessarily fail," *Mahmood v. Holder*, 570 F.3d 466, 469 (2d Cir. 2009) (cleaned up), we may exercise limited jurisdiction to "remand to the BIA so it may exercise its [sua sponte] authority against the correct legal background." *Pllumi v. Attorney Gen.*, 642 F.3d 155, 160 (3d Cir. 2011) (quotation omitted); *see Reyes-Vargas v. Barr*, 958 F.3d 1295, 1300 (10th Cir. 2020).

After erroneously concluding Petitioner was not eligible for cancellation of removal based on the final-order rule, the BIA concluded by saying: "Finally, we decline to exercise our discretionary sua sponte authority to reopen these proceedings for the [Petitioner] to apply for cancellation of removal." Given this sentence follows the BIA's comparatively in-depth application of the final-order rule (two paragraphs versus one sentence), we cannot discern whether the BIA declined to exercise its sua sponte authority based on an erroneous view of the law. In light of this uncertainty, we must remand to the BIA so that it can reconsider whether to reopen sua sponte against the correct legal background. *Berdiev*, 13 F.4th at 1138; *see Zzyym v. Pompeo*, 958 F.3d 1014, 1033 (10th Cir. 2020) ("If we can't determine whether the agency necessarily relied on deficient reasons, it would make little sense to uphold the agency's action. In these cases, remand is appropriate."). On remand, the BIA is free

18

to deny or grant reopening sua sponte, and we have no jurisdiction to review such a decision. *Pllumi*, 642 F.3d at 160; *see Berdiev*, 13 F.4th at 1130.

As an alternative basis for excusing her motion's lateness, Petitioner argued she was entitled to equitable tolling.[3]  Equitable tolling is appropriate where the movant shows (1) that she has been pursuing her rights diligently, and (2) that some extraordinary circumstance stood in her way and prevented timely filing.  *Holland v. Florida*, 560 U.S. 631, 649 (2010).   In rejecting Petitioner's equitable tolling arguments, the full extent of the BIA's analysis was "we find no extraordinary circumstance which would warrant equitable tolling of the [Petitioner]'s motion" with a general cite to *Holland*—a prisoner habeas corpus case.  Our only concern is whether this analysis was so cursory or conclusory that it constitutes an abuse of discretion. *Qiu*, 870 F.3d at 1202.  We do not, in any way, prejudge whether Petitioner is entitled to equitable tolling.

The Government argues the BIA's analysis could not be too cursory because Petitioner's equitable tolling argument before the BIA was itself cursory.  (By limiting its present discussion of sua sponte reopening and equitable tolling to one footnote, the Government is doing the same thing.)   In her motion to reopen, Petitioner argued

---

[3] Petitioner's motion to reopen was both time- and number-barred.  8 C.F.R. § 1003.2(c)(2).  The parties seem to implicitly agree that equitable tolling may excuse both the lateness and duplicity of Petitioner's motion to reopen.  We assume, without deciding, the parties are correct.  "We question, however, whether equitable *tolling* is the appropriate framework for analyzing whether a second motion to [reopen] may be considered, as there is no clock to toll with a number bar."  *Omar v. Lynch*, 814 F.3d 565, 569 n.1 (1st Cir. 2016).

19

*Pereira* and *Banuelos-Galviz* "constitute[d] an extraordinary circumstance" preventing her timely filing.[4]   Equitable tolling claims "based on changes in the law are not unheard of." *Lona v. Barr*, 958 F.3d 1225, 1230–31 (9th Cir. 2020).  The Fifth Circuit, for example, remanded for the BIA to consider a change-in-the-law equitable tolling claim in *Lugo-Resendez v. Lynch*, 831 F.3d 337 (5th Cir. 2016).  And on remand, the BIA accepted that the change in law justified equitable tolling.  *Lugo-Resendez*, 2017 WL 8787197, at *3 (B.I.A. Dec. 28, 2017).

Based on our research, the closest we came to recognizing such a claim was in an unpublished decision: *Olivas-Melendez v. Wilkinson*, 845 F. App'x 721 (10th Cir. 2021).  There, the petitioner argued the lateness of his motion to reopen "should be subject to equitable tolling because upon learning of a fundamental change in the law he acted with due diligence."  *Id.* at 727 (cleaned up).  We ultimately affirmed the BIA's decision denying equitable tolling, but we said nothing about whether changes in the law can serve as a basis for equitable tolling.  Because it is unnecessary to answer that question today, we do not.  Instead, we hold that because the BIA seems to have considered change-in-the-law equitable tolling arguments before, the BIA abused its discretion in this case by failing to "announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Ismaiel v. Mukasey*, 516 F.3d 1198, 1207 (10th Cir. 2008) (quoting *Becerra-Jimenez v. INS*, 829 F.2d 996, 1000 (10th Cir. 1987)).

---

[4] Petitioner raised other arguments for equitable tolling, but it is unnecessary to consider these arguments at this stage.

One sentence, devoid of any analysis, concluding there was no extraordinary circumstance which would warrant equitable tolling is insufficient for us to perceive the BIA reasoned at all—at least when the sentence appears in the wake of a more analytically substantial but erroneous application of the final-order rule. *See Qiu*, 870 F.3d at 1202. There are, in these circumstances, too many "danger signals" suggesting the BIA "has not genuinely engaged in reasoned decision-making." *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970). We cannot discern why the BIA found no extraordinary circumstance which would warrant equitable tolling, so the BIA abused its discretion. This is not to say that the BIA cannot once again conclude Petitioner is ineligible for equitable tolling. Instead, we narrowly conclude the BIA's equitable tolling analysis was too perfunctory for judicial review, meaning remand is appropriate. *See Qiu*, 870 F.3d at 1202, 1206.

\*          \*          \*

Nothing in this opinion should be read to express a view on the ultimate merits of Petitioner's case. On remand, the Government is free to argue that Petitioner should not be granted sua sponte reopening or equitable tolling. This opinion is expressly limited to two conclusions. First, the BIA's application of the final-order rule was legal error. Second, the BIA's explanations for denying sua sponte reopening and equitable tolling constituted, as a procedural matter, an abuse of discretion.

For the reasons stated herein, we **GRANT** the petition for review and **REMAND** to the BIA for further proceedings not inconsistent with this opinion.

21