FILED
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**August 30, 2022**

**FOR THE TENTH CIRCUIT**
_____

**Christopher M. Wolpert**
**Clerk of Court**

BOUCADARY SIMPARA,

    Petitioner,

v.

MERRICK B. GARLAND,
United States Attorney General,

    Respondent.

No. 21-9584
(Petition for Review)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **MATHESON** and **EID**, Circuit Judges.
_____

Boucadary Simpara petitions for review of a decision by the Board of

Immigration Appeals ("BIA") dismissing his appeal and denying his motion to

remand to the Immigration Judge ("IJ"). Because Mr. Simpara failed to exhaust

several issues before the BIA that he raises in his petition for review, we dismiss his

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

petition in part for lack of jurisdiction. Exercising jurisdiction under 8 U.S.C. § 1252(a)(1), we deny the petition on the remaining issues because Mr. Simpara does not demonstrate (1) error in the BIA's dismissal of his appeal or (2) an abuse of discretion in its denial of his motion to remand.

## I. BACKGROUND

Mr. Simpara is a native and citizen of Mali. In 2013, he entered the U.S. on a student visa at age 18. In 2021, an IJ found him removable based on his failure to comply with his student visa. She also denied his applications for withholding of removal and relief under the Convention Against Torture ("CAT"). The BIA denied his appeal. It also denied his motion to remand to the IJ, in which he argued changed country conditions in Mali.

Mr. Simpara bases his claims for relief on fear that his family, with the government's help, will persecute and torture him if he is removed to Mali. He bases this fear on his having—during his time in the U.S.—gotten tattoos, married outside of his tribe without his family's permission, converted from Islam to Christianity, and been arrested and jailed for a criminal sex offense—all, he says, in violation of Islamic Sharia law. He also contends that he fears that non-family members will persecute and torture him in Mali.

### A. *Mr. Simpara's Declaration and Testimony*

In his declaration and testimony before the IJ, Mr. Simpara said the following:

2

He has been in the U.S. since 2013, but lost his visa status in 2016 when he discontinued his studies. In 2017, without his family's permission, Mr. Simpara married a U.S. citizen who is not from his tribe. He also got two large tattoos, which, he says, Islam strictly forbids. Mr. Simpara was arrested for a criminal offense in 2019.[1] While in immigration detention, he converted to Christianity.

In Mali, Mr. Simpara lived in a large house with his wealthy and powerful immediate and extended family, including two uncles' families. His family is also his tribe. His father and one uncle are wealthy. Each owns several businesses. He said that another uncle, a tribal leader in his village, makes decisions for the rest of the family, including whom one can marry. Mr. Simpara's relatives have connections to the Malian government, including two past presidents. He testified that his father has a personal relationship with a general who has done favors for him, including detaining a man until he paid a debt to Mr. Simpara's father.

Mr. Simpara said his family practices a strict version of Islam and Sharia law.[2] He said that his tribal-leader uncle imposes punishments at the mosque, including ordering beheadings. When he was 10, Mr. Simpara said he witnessed a man's hand being cut off for stealing. In Mr. Simpara's village, a man who admitted to adultery

---

[1] Mr. Simpara states that, while his BIA appeal was pending, he pled guilty to violating Colo. Rev. Stat. § 18-3-306, internet luring of a child under the age of 15.

[2] The following summarizes Mr. Simpara's and his aunt's testimony presented to the IJ. We take no position on the accuracy of their description of Sharia law.

was publicly condemned to be killed, then never seen again. He said that government officials, including the village police, did nothing to stop these punishments.

Mr. Simpara said family members were punished for Sharia law violations. A cousin received 100 lashes at the mosque for having premarital sex. Another cousin was frequently whipped and beaten at age 18 or 19 when he snuck out of the house and repeatedly failed to listen to the elders. Mr. Simpara stated that his uncle whipped him when he was 10 for watching pornography. When he was 11, his father and uncle whipped him 80 times for sneaking out of the house to see a friend, leaving him scarred. His father also once whipped him for skipping school.

Mr. Simpara said he is almost certain his family would kill him in Mali for violating Sharia law and bringing dishonor to the family. Although they are aware of his arrest in the U.S., they may not yet know about his marriage, tattoos, or conversion to Christianity. He has had no contact with them since his arrest. No one in Mr. Simpara's family has ever been arrested, and he believes that his arrest alone—for a sexual crime—would be enough for his family to make him disappear. Mr. Simpara said that, although his family would give him a chance to return to Islam, if he does not, they would kill him; and if he does, they would still punish him. Mr. Simpara said that if he is not killed, his uncle would skin the tattoos off of his body. He testified that he would have to abandon his marriage because he would not put his wife in danger in Mali.

4

Mr. Simpara believes his family will learn he is returning to Mali, either from his aunt and uncle in the U.S.[3] or from the Malian government. He said he would be killed if he returned to his family's home, but he would also be unable to live safely anywhere else in Mali because his family would use their government connections to find and kill him. Because his last name indicates his tribe, Mr. Simpara does not believe he could successfully hide in Mali due to a military presence at the airport and at every checkpoint. He said his father could use government connections to cause state-run television and radio to post alerts about him, and his uncle would communicate with other Muslim leaders to find him. Once found, Mr. Simpara believes his father will either kill him or ask the government to make him disappear so he does not bring dishonor to the family.

The IJ found Mr. Simpara's testimony to be credible and consistent with his application and the other evidence.

## B. *Aunt's Declaration*

Mr. Simpara's aunt, Aminata Keita, submitted a declaration stating the following. Mr. Simpara lived with his aunt and uncle for the first two years he was in the United States. They have watched over him for his family. She is familiar with Mr. Simpara's parents from their visit to the United States. Ms. Keita stated

---

[3] According to custom, Mr. Simpara refers to these family friends who live in Denver, Colorado, as his "aunt" and "uncle."

that Mr. Simpara's family practices a strict version of Islam: the father makes all decisions for the family, and those who disobey, even adults, can be beaten. Ms. Keita is also a very religious, practicing Muslim.

Ms. Keita said that her husband told Mr. Simpara's family about his arrest. She believes his family is upset, and they have shown no interest in helping him. She thinks his family believes he is bringing shame upon them and that they will be shocked to learn of his marriage. In his tribe, marriages are arranged between tribe members. She said that someone who marries otherwise would be banished from the family. They would not allow and would react negatively to Mr. Simpara's tattoos. Ms. Keita was upset when she learned that Mr. Simpara has become a Christian. She said that changing religions is "strictly prohibited." Admin. R. at 576. "People from religious families get killed from changing religions." *Id*. Mr. Simpara's family would try to make him return to Islam "or take it to the next level and punish him." *Id*.

Considering all of Mr. Simpara's transgressions, Ms. Keita "think[s] there is a very real chance that [Mr. Simpara's] family will kill him for bringing dishonor on his family. . . . You are putting a shame on the family, and they take that seriously. . . . That's the end of you." *Id*. According to Ms. Keita, Mr. Simpara "could easily disappear." *Id*. "Wherever he goes, trouble will follow him there, because his family will search for him. His family is wealthy and powerful. . . . [H]e will be in danger there." *Id*.

6

C. *Expert Report*

Mr. Simpara's expert on Francophone West Africa presented the following facts and opinions in a report:[4]

The expert stated that strict interpretations of Islamic law call for punishments in the form of lashes, amputations, beheadings, stonings, and other physical brutality, which have become more routine in Mali in the past six years. Local authorities and religious/traditional leaders are the true holders of power in Mali, having authority to discipline under Islamic law. She said that the inferiority of junior men is enshrined in the Family Law Code in Mali and disciplinary violence against less-powerful family or clan members is common.

The expert opined that Mr. Simpara would likely be subjected to physical punishment and torture by his family in Mali because he is a member of a conservative Muslim family with influential elders and he has rejected the religious and social laws of his clan. She believes that they will most likely harm him and/or turn him over to state agents to harm him as a result of his rejection of Islam, tattoos, marrying without his family's consent, and becoming attached to Christianity. She said his tattoos would be a visible mark of resistance to the clan and religious identity his family has worked to preserve for generations.

---

[4] As with Mr. Simpara and Ms. Keita, we take no position on the accuracy of the expert's discussion of Sharia law.

The expert noted that Mr. Simpara's relatives are connected to the government through national commerce (his uncle manages a state-connected corporation) and local leadership (another uncle is the leader of his clan's Sufi brotherhood). She believes these connections give his family greater authority to discipline its members without government interference. The expert characterized as credible and reasonable Mr. Simpara's fear of torture by his relatives for his behaviors and practices while in the U.S.

The expert said that a military-led coup in Mali in August 2020 has diminished the country's security. She believes that the new military government interferes even less than the previous regime in family leaders' assertion of authority. She opined that Mr. Simpara would face a range of persecution in Mali, including by the government, militant Islamic groups, and his family. The expert concluded that, overall, Mr. Simpara "is at severe risk of severe ill treatment and torture in Mali . . . aris[ing] from his rejection of Malian norms, including Islam, traditionally pious personal practices involving bodily non-modification, and family consent in marriage." Admin. R. at 603-04.[5]

---

[5] The expert also testified at Mr. Simpara's IJ hearing. The IJ found her testimony was probative and persuasive regarding the disputed issues and provided context to the evidence presented.

D. *Agency Decisions*

1. **Immigration Judge**

The IJ denied Mr. Simpara's applications for withholding of removal and protection under the CAT.

a. *Denial of withholding of removal*

The IJ first held that Mr. Simpara failed to demonstrate that the whippings by his family when he was a child in Mali were on account of a protected ground. The IJ stated, "The family's motivation for harming the applicant was not on account of a protected ground, but rather an attempt to discipline their child." Admin. R. at 219.

Because Mr. Simpara did not suffer past persecution on account of a protected ground, the IJ noted he must demonstrate it is more likely than not he would be subjected to future persecution on such a ground in Mali. The IJ found that, despite his fears, Mr. Simpara did not meet his burden. Among other references to the record, the IJ noted (1) the lack of evidence that Mr. Simpara had "been threatened either directly from any member of his family or indirectly through his aunt and uncle who live in the United States," *id.*; (2) Mr. Simpara believes his family is aware of his pending criminal case, but is unsure whether they know about his marriage, tattoos, or conversion to Christianity; and (3) Mr. Simpara's aunt expressed fear that he will be banished from his family for his transgressions and may punish him.

Although the IJ acknowledged the possibility that Mr. Simpara would face harm if he returns to Mali, she concluded that "[t]he record does not establish a clear

probability that [Mr. Simpara's] parents are motivated to harm him if he is returned nor does it establish a clear probability that his parents are motivated to ask the government to harm him on their behalf if he is returned." *Id.* at 220.

b. *Denial of protection under the CAT*

The IJ found that Mr. Simpara's CAT claim was too speculative to satisfy the requisite burden of proof for deferral of removal. Noting that his fear is based, in part, on his experiences in Mali as a child and punishments he received from his father and his powerful uncle, the IJ found that "even if his childhood incidents constituted torture, they are insufficient to find [Mr. Simpara] met his burden to establish it is more likely than not he would be tortured in the future." *Id.* at 221.

The IJ observed that country-conditions evidence indicated that family violence amounting to torture is used in Mali. But she concluded the record contained insufficient evidence to establish a likelihood that Mr. Simpara's family, or anyone under its direction, is motivated to harm him based upon his violations of his family's rules and expectations while in the United States, including his tattoos, marriage outside his clan, conversion to Christianity, and arrest. Acknowledging Mr. Simpara's belief "that his family will punish him in accordance with Sharia law," the IJ concluded that "there is insufficient evidence of particularized threats or harm to persuade the Court that they are intent on punishing him." *Id.* at 222.

Noting that Mr. Simpara does not plan to return to his family home and his belief his family will still find and harm him in Mali using government resources, the

10

IJ found the evidence did not establish a likelihood his family would do so. Pointing to evidence of country conditions indicating current turmoil and violence, she concluded that, even assuming his family was well-connected before the August 2020 coup, the record did not establish a likelihood that they continue to be.

The IJ concluded, "In sum, the applicant did not establish that it is more likely than not that his family, or anyone acting on their behalf, would seek out and find the respondent in Mali, and upon finding him, would more likely than not torture him." *Id.*

2. **BIA**

    a. *Affirm the IJ*

The BIA affirmed the IJ's denial of withholding of removal. It affirmed the IJ's determination that Mr. Simpara did not demonstrate past persecution, "discern[ing] no clear error in the [IJ's] finding that the family's motivation for punishing him was an attempt to discipline him, rather than to harm him on account of a protected ground." *Id.* at 4. The BIA further found no clear error in the IJ's determination that Mr. Simpara failed to show a likelihood of future persecution in Mali. It stated:

> While we acknowledge that the respondent's family practices a strict version of Islam that includes Sharia law punishments, the record does not reflect that the respondent has been threatened, either directly or indirectly, by any member of his immediate family, or indirectly through his aunt or uncle who live in the United States. The letter submitted by the respondent's aunt indicates only that the respondent will be

11

> banished from his family for his transgressions, and that his
> family may punish him.  However, his aunt's letter does not
> indicate that the respondent's family in Mali relayed any
> threats of harm towards the respondent if he were to return to
> Mali.

*Id.* (citation and footnote omitted).

The BIA also affirmed the IJ's denial of protection under the CAT.  It affirmed the IJ's determination that the record failed to show that Mr. Simpara will more likely than not be subjected to torture.  The BIA "again acknowledge[d] that [Mr. Simpara's] family practices a strict version of Islam, including the adherence to Sharia law punishments."  *Id.* at 5.  It also noted that he fears harm from his family based on the cited violations of the Koran, and that family violence amounting to torture is used in Mali.  But the BIA concluded that the record failed to show that the IJ clearly erred because, despite his family's knowledge of some of his conduct, they have not threatened to harm him, nor have his aunt and uncle in Denver relayed any threats.  And although the country-conditions evidence shows general unrest and family violence in Mali, the BIA concluded it does not show that Mr. Simpara faces a particularized risk.

The BIA also relied on the IJ's finding that there was insufficient evidence to show that Mr. Simpara's family would be able to find and harm him using government resources in light of the recent coup and turmoil in Mali.  The BIA stated that, even if his family was well-connected to the previous regime in Mali, there was

12

insufficient evidence that it has a continued relationship with the government

currently in place.  The BIA concluded:

> We agree with the Immigration Judge that the
> respondent's claim for relief under the CAT is based on his
> speculative assertion that, upon his return to Mali, his family
> would seek him out for harm and find him anywhere in the
> country, and, upon finding him, torture him with the
> acquiescence or consent of the current government.  His
> belief that his family will seek to punish him in accordance
> with Sharia law, without more, is insufficient to meet his
> burden to show that he faces an[] individualized risk of
> torture in Mali.

*Id.*

### b. *Denial of motion to remand*

Mr. Simpara filed a motion to remand with his BIA appeal, attaching an

addendum expert report and articles, which the BIA concluded were new and

previously unavailable.  The new evidence related to another military coup in Mali in

May 2021.  The BIA decided this evidence reflected conditions that were

substantially similar to those at the time of Mr. Simpara's IJ hearing, which occurred

in the aftermath of the previous military coup in August 2020.  The BIA concluded

the proffered evidence did not reflect a change in country conditions because there

was already political instability in Mali at the time of his hearing.

The BIA also found that the new evidence failed to establish Mr. Simpara's

prima facie eligibility for relief or would otherwise affect the outcome of his case.  It

said the evidence did not address how the latest coup affects whether his family will

13

be able to prevail on the current government to use resources to harm him. Finally, to the extent the new evidence related to jihadist groups in Mali, the BIA found it did not demonstrate that Mr. Simpara would likely be persecuted because he testified that his family does not condone such groups. The BIA therefore denied Mr. Simpara's motion to remand.

Mr. Simpara did not seek reconsideration of the BIA's decision.

## II. DISCUSSION

Mr. Simpara challenges the BIA's denial of withholding of removal, protection under the CAT, and his motion to remand to the IJ.

### A. *Legal Background*

#### 1. Exhaustion and Jurisdiction

Under 8 U.S.C. §1252 (d)(1) we have jurisdiction over claims challenging a final order of removal 'if the alien has exhausted all administrative remedies available as of right.'" *See Sidabutar v. Gonzales*, 503 F.3d 1116, 1118 (10th Cir. 2007); *see Akinwunmi v. INS*, 194 F.3d 1340, 1341 (10th Cir. 1999) (per curiam) (holding this court lacks jurisdiction to consider a claim the petitioner did not first present to the BIA).

"It is a fundamental principle of administrative law that an agency must have the opportunity to rule on a challenger's arguments before the challenger may bring those arguments to court." *Garcia-Carbajal v. Holder*, 625 F.3d 1233, 1237 (10th Cir. 2010). In the immigration context, "[i]t is not enough to go through the

14

procedural motions of a BIA appeal, or to make general statements in the notice of appeal to the BIA, or to level broad assertions in a filing before the Board." *Id.* (quotations omitted). Rather, "[t]o satisfy § 1252(d)(1), an alien must present the *same specific legal theory* to the BIA before he or she may advance it in court." *Id.* Thus, Mr. Simpara "may not add new theories seriatim as the litigation progresses from the agency into the courts." *Id.* at 1238.

Thus, before we turn to the merits of Mr. Simpara's contentions, we must determine whether we have authority to consider them. *See Sierra v. INS*, 258 F.3d 1213, 1216 (10th Cir. 2001) ("We have an independent duty to examine issues relating to our jurisdiction."). That is, we must determine whether Mr. Simpara exhausted his contentions before the BIA.

2. **Standard of Review**

We review the agency's legal determinations de novo and its factual findings under the substantial evidence standard. *See Karki v. Holder*, 715 F.3d 792, 800 (10th Cir. 2013). In the immigration context, the substantial evidence standard means that "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). *See Rivera-Barrientos v. Holder*, 666 F.3d 641, 645 (10th Cir. 2012). "In this circuit, the determination whether an alien has demonstrated persecution is a question of fact[.]" *Ritonga v. Holder*, 633 F.3d 971, 974 (10th Cir. 2011) (quotations omitted). "Similarly, a request for protection under the CAT involves factual determinations

15

reviewed for substantial evidence." *Htun v. Lynch*, 818 F.3d 1111, 1118 (10th Cir. 2016). In applying this deferential standard, "[w]e do not weigh the evidence or evaluate the witnesses' credibility." *Sarr v. Gonzales*, 474 F.3d 783, 789 (10th Cir. 2007) (ellipsis and quotations omitted).

Because a single member of the BIA affirmed the IJ's decision in a brief order, *see* 8 C.F.R. § 1003.1(e)(5), we review the BIA's opinion rather than the decision of the IJ, *see Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006). "However, when seeking to understand the grounds provided by the BIA, we are not precluded from consulting the IJ's more complete explanation of those same grounds." *See Uanreroro*, 443 F.3d at 1204.

3. **Withholding of Removal**

An applicant for withholding of removal must show that if he returns to his country, his life or freedom would be threatened based on one of five protected grounds: race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1231(b)(3)(A). He must establish a clear probability of persecution based on a protected ground by showing that such persecution is more likely than not to occur. *See Razkane v. Holder*, 562 F.3d 1283, 1287 (10th Cir. 2009).

4. **Convention Against Torture**

"[T]he Convention Against Torture prohibits the return of an alien to a country where it is more likely than not that he will be subject to torture by a public official,

16

or at the instigation or with the acquiescence of such an official." *Karki*, 715 F.3d at 806 (quotations omitted). "Acquiescence of a public official requires that the public official, prior to the activity constituting the torture, have awareness of such activity and thereafter breach his or her legal responsibility to prevent such activity." *Id.* (quotations omitted). "[W]illful blindness suffices to prove acquiescence." *Id.* (quotations omitted).

## B. *Analysis*

On appeal, Mr. Simpara raises four issues and asserts various arguments supporting each.

First, he contends that the BIA legally erred in upholding the IJ's determination that he is not likely to be persecuted or tortured by (a) imposing a rule that there is no likelihood of persecution or torture in the absence of express threats, (b) ignoring other evidence that he will be harmed by non-family members, and (c) ignoring other evidence that he will be harmed by family members.

Second, Mr. Simpara argues that, in denying protection under the CAT, the BIA (a) misapplied the agency's decision in *In re J-F-F-*, 23 I. & N. Dec. 912 (A.G. 2006), (b) ignored evidence of past torture, (c) failed to consider the aggregate risk of torture, and (d) ignored evidence that his family will harm him using government resources.

Third, he asserts the BIA legally erred in denying withholding of removal by (a) applying the wrong standard of review to the IJ's determination that he did not

suffer past persecution on account of a protected ground, and (b) disregarding that persecution may be based on mixed motives; alternatively, (c) he argues the BIA's determination is not supported by substantial evidence.

Fourth, Mr. Simpara argues the BIA abused its discretion in denying his motion to remand to the IJ.

We address each of these issues in turn.

1. **Did the BIA Err in Relying on a Lack of Express Threats by Mr. Simpara's Family in Upholding the IJ's Determination that He is Not Likely to be Persecuted or Tortured?**

Mr. Simpara challenges the BIA's reliance on a lack of any express threat of harm by his family in upholding the IJ's determination that he is not likely to be persecuted or tortured in Mali. The following three arguments concern both his withholding of removal and CAT claims. We lack jurisdiction to consider the first two arguments, but we have it to consider the third.

a. *No explicit threat*

Mr. Simpara first argues that the BIA erroneously upheld the IJ's determination that his family is not likely to persecute or torture him solely because his family has not expressly threatened him. *See* Pet'r's Opening Br. at 24-26. Citing case law, he characterizes this as a "legal error, because the BIA may not

18

impose a rule that express threats are necessary to establish likely harm." *Id.* at 16; *see also id.* at 26 (contending "the BIA erred as a matter of law").

Mr. Simpara did not exhaust this contention in his BIA appeal. In denying his applications for withholding of removal and CAT protection, both the IJ and the BIA relied on the fact that his family has not expressly threatened him. The IJ noted the lack of such a threat multiple times in her decision. *See* Admin. R. at 204-07. In his BIA appeal, Mr. Simpara pointed to the IJ's lack-of-threat finding and argued it did not undermine his other evidence. *See id.* at 30-31, 35. But he did not argue that the IJ legally erred by imposing a rule that express threats are necessary to establish likely harm. Nor did he cite any of the cases he now relies upon for this proposition. Because this "specific legal theory" is unexhausted, we lack jurisdiction to consider it. *Garcia-Carbajal*, 625 F.3d at 1237 (italics omitted).

b. *Non-family members*

Mr. Simpara also contends that, by considering only the lack of express threats by family members, the BIA ignored other evidence showing he will be harmed by non-family members, particularly government officials and militant Islamists. *See* Pet'r's Opening Br. at 26-27. He maintains that the BIA's rulings completely disregarded a statement in his declaration and his expert's report and testimony about his fear of harm from government officials and militant Islamists. He characterizes

19

this as a legal error, contending the BIA "'is not permitted simply to ignore or misconstrue evidence.'" *Id.* at 26 (quoting *Karki*, 715 F.3d at 800).

Mr. Simpara did not exhaust this contention in his BIA appeal. Both the IJ and the BIA construed his claims for relief to be centered on his fear of persecution and torture by his family in Mali, with the assistance and/or acquiescence of the Malian government. Neither the IJ nor the BIA assessed any claim that Mr. Simpara is likely to be independently persecuted or tortured by non-family members. And Mr. Simpara did not argue in his BIA appeal that the IJ erred, legally or otherwise, by ignoring his evidence of a likelihood of harm by non-family members, specifically government officials and militant Islamists.

Mr. Simpara asserts in his reply brief that he exhausted this issue because his BIA appeal presented his arguments more specifically than the petitioners had in *Orellana-Recinos v. Garland*, 993 F.3d 851 (10th Cir. 2021). *Orellana-Recinos* is distinguishable. In that case, we held that "the lack of an appellate brief to the BIA does not by itself deprive us of jurisdiction" and that the "Petitioners' notice of appeal to the BIA adequately presented their legal theory," which was "the same challenge Petitioners present[ed] to this court." *Id.* at 859.

In contrast, Mr. Simpara filed a brief to the BIA and failed to argue before the BIA, as he does here, that the IJ erroneously narrowed his claim to a fear of

20

persecution by family members.[6]  His contrary assertions, *see* Pet'r's Reply Br. at 10-11, are not persuasive.  The factual scenarios in his BIA appeal presented anticipated persecution or torture from "religious elders" as limited to family or clan members, rather than unrelated militant Islamists.  Although he cited the deteriorating security situation in Mali in his BIA appeal, he did so to argue a heightened risk of harm to him from his tribal elders.  *See* Admin. R. at 30, 32, 34, 37-38.  And he cited evidence that fundamentalist Muslims use torture to support his contention that his family would do so.  *See id.* at 34.  Because Mr. Simpara's specific legal theory regarding a fear of persecution by non-family members is unexhausted, we lack jurisdiction to consider it.

c.  *Family members*

Unlike the foregoing arguments, Mr. Simpara did exhaust before the BIA his argument that the agency ignored evidence that his family is likely to persecute and torture him.  *See* Pet'r's Opening Br. at 27-28; Admin. R. at 30-36.  We therefore have jurisdiction to consider this contention.

Mr. Simpara contends that, by focusing on the lack of express threats of harm by his family, the BIA ignored other significant evidence in concluding that he failed to demonstrate a likelihood of future persecution or torture in Mali.  In *Karki*, we

---

[6] Also, unlike in *Orellana-Recinos*, Mr. Simpara did not include this argument in his notice of appeal to the BIA.  *See* Admin. R. at 198-200.

stated that "the BIA may not simply overlook evidence in the record that supports the applicant's case" and is "not permitted simply to ignore . . . evidence in the . . . applicant's favor." 715 F.3d at 800 (quotations omitted). Mr. Simpara argues that the BIA failed to adequately consider evidence demonstrating that, if he returns to Mali, his family will be able to locate him and will harm him. Though he points us to a portion of the background facts summarized earlier in his brief, Mr. Simpara does not explain how the BIA ignored or failed to adequately consider the cited evidence. *See* Pet'r's Opening Br. at 27-28 (citing evidence summarized at 9-10).

The BIA did not "ignore" some of the evidence Mr. Simpara cites. It noted each of his asserted violations of Sharia law, his family's possible lack of knowledge of some of these violations, the whippings he experienced as a child, and his family's adherence of a strict version of Sharia law and punishments. *See* Admin. R. at 4, 5. The BIA also acknowledged Mr. Simpara's expert evidence that family violence amounting to torture is used in Mali and his family's connections with the Malian government and military that he claims would enable them to find him. *See id.* at 5.

That said, the BIA did not specifically mention other evidence that Mr. Simpara identifies in his opening brief. It did not discuss his relative certainty that his family will punish him, the specific punishments he believes his family will impose, his belief that his family will try to find him using the Muslim Brotherhood networks, or his aunt's statement that "there is a very real chance that

[Mr. Simpara's] family will kill him for bringing dishonor on his family." Admin. R. at 576.

Mr. Simpara asserts that "[t]he BIA's decision should be vacated because it failed to address this critical evidence." Pet'r's Opening Br. at 28. We disagree. Although "[t]hese facts are not specifically mentioned in the BIA's decision, . . . the BIA is not required to discuss every piece of evidence when it renders a decision." *Hadjimehdigholi v. INS*, 49 F.3d 642, 648 n.2 (10th Cir. 1995). And Mr. Simpara does not develop an argument—nor do we see any basis to conclude—that the BIA's findings regarding his risk of future torture and persecution in Mali consisted only of "conclusory statements" or failed to "set[] out terms sufficient to enable us as a reviewing court to see that the Board has heard, considered, and decided." *Id.* (quotations omitted).

We have considered contentions that the BIA ignored evidence in the context of a petitioner's argument that the BIA's decision was not supported by substantial evidence. In *Karki*, for example, the petitioner argued that substantial evidence did not support the BIA's factual determinations. We concluded the BIA had ignored certain evidence and that the record compelled a different conclusion. *See* 715 F.3d at 801-02, 804; *see also id.* at 805-07 (concluding the BIA failed to consider certain evidence and the record as a whole did not reasonably support the BIA's findings); *Yuk v. Ashcroft*, 355 F.3d 1222, 1235-36 (10th Cir. 2004) (acknowledging contention the IJ ignored evidence contradicting the IJ's finding; stating the court would not

23

reweigh the evidence and holding the IJ's decision was supported by substantial evidence).

Unlike in these cases, however, Mr. Simpara simply points to certain evidence favorable to his claim that his family is likely to harm him, which he says the BIA ignored due to its focus on a lack of express threats. *See* Pet'r's Opening Br. at 9-10, 27-28. He does not contend that an absence of threats is irrelevant to the risk of harm he faces from his family.[7] Nor does he develop an argument as to why the lack of such threats does not support the BIA's decision under the substantial evidence standard that he failed to demonstrate a clear probability of persecution or torture by his family in Mali.

2. **Did the BIA Otherwise Err in Affirming the IJ's Denial of CAT Protection?**

Mr. Simpara argues that in affirming the IJ's denial of CAT protection, the BIA (a) misapplied agency precedent, (b) ignored evidence of past torture, (c) failed to aggregate all risks of torture, and (d) ignored evidence his family would harm him using government resources. We lack jurisdiction to consider the first three arguments, but we have it to consider the fourth.

---

[7] In contrast, Mr. Simpara *does* contend that a lack of threats by his family is irrelevant to his risk of harm by non-family members. *See* Pet'r's Opening Br. at 27 ("[T]he only justification the BIA offered to deny relief—the lack of express threats by family members—has no impact on whether Mr. Simpara will be harmed by non-family members.").

a. *Agency precedent*

Mr. Simpara argues the BIA misapplied *In re J-F-F-*, 23 I. & N. Dec. 912 (A.G. 2006), in affirming the IJ's denial of his application for CAT relief. *See* Pet'r's Opening Br. at 28-33. In that case, the IJ had granted a noncitizen protection under the CAT by "[stringing] together a series of suppositions" about what would occur if he were to be removed. *In re J-F-F-*, 23 I. & N. Dec. at 917. The BIA affirmed, *id.* at 912, but the Attorney General reversed, stating, "[t]he evidence does not establish that any step in this hypothetical chain of events is more likely than not to happen, let alone that the entire chain will come together to result in the probability of torture of respondent," *id.* at 917-18. The Attorney General added,

> An alien will never be able to show that he faces a more
> likely than not chance of torture if one link in the chain
> cannot be shown to be more likely than not to occur. It is the
> likelihood of all necessary events coming together that must
> more likely than not lead to torture, and a chain of events
> cannot be more likely than its least likely link.

*Id.* at 918 n.4.

i. First *In re J-F-F-* challenge

Mr. Simpara first contends it was inappropriate for the BIA to apply *In re J-F-F-* because he has not relied on a hypothetical chain of events. He says "he contended far more directly that his family will torture him with the acquiescence of government." Pet'r's Opening Br. at 29. But he did not exhaust this contention of error in his BIA appeal.

25

In his closing argument before the IJ, Mr. Simpara set forth the particular chain of events that he contended was likely:  (1) his family would seek to punish him, (2) his family would be able to find him anywhere in Mali with the assistance of the government and social networks, and (3) the government would acquiesce in his torture by harming him or turning a blind eye to the family's violence against him. *See* Admin. R. at 445-46.  The IJ referenced this chain of events in her decision, citing *In re J-F-F-*.  *Id.* at 205-06.  Yet Mr. Simpara did not argue in his BIA appeal, as he does now, that the IJ erred by relying on *In re J-F-F-*, nor did he assert that his CAT claim was not based on a hypothetical chain of events.  Because this claim of error is unexhausted, we lack jurisdiction to consider it.

### ii.  Second *In re J-F-F-* challenge

Mr. Simpara alternatively contends that if he did rely on a hypothetical chain of events, the agency erred in applying *In re J-F-F-* at the second step by concluding his family would not find him using government resources.  He asserts that:

> (1) by requiring his family to "find" him, the agency presupposed that he would live in hiding if returned to Mali, yet the agency failed to consider whether it is possible for him to relocate internally;

> (2) the agency's focus on third-party actors using government resources to carry out torture effectively conflated *In re J-F-F-* and the CAT standard for state action, which requires only that government officials

26

either acquiesce to torture by third-party actors or
directly perpetrate torture; and

(3) because the agency considered only whether his family
would find him using government channels, as
opposed to social networks, it artificially narrowed the
chain of events that might result in torture,
contravening *In re J-F-F-*'s holding that the agency
must consider all evidence relevant to the possibility
of torture.

*See* Pet'r's Opening Br. at 30-32.

Mr. Simpara did not exhaust any of these contentions in his BIA appeal. First,
the IJ found at the second step that the evidence did not establish a likelihood that his
family would find him in Mali using government resources. Yet Mr. Simpara did not
argue to the BIA that the IJ failed to conduct an inquiry regarding possible relocation
within Mali. Second, if the IJ erred by conflating the standards under the CAT and *In
re J-F-F-*, Mr. Simpara did not raise such an error in his BIA appeal. Third, in
describing the likely chain of events at the IJ hearing, Mr. Simpara did state that his
family would be able to find him using "social networks" and "networks throughout
the country of the Muslim brotherhood." Admin. R. at 446. But then the IJ
considered only his claim that his family would find him "using government
resources," *id.* at 206, and he did not raise such an error in his BIA appeal. Because
all of these issues are unexhausted, we lack jurisdiction to consider them.

27

b. *Past Torture*

The IJ addressed Mr. Simpara's evidence of past torture, but concluded that "even if his childhood incidents constituted torture, they are insufficient to find [he] met his burden to establish it is more likely than not he would be tortured in the future." *Id*. Mr. Simpara asserts that, although the BIA mentioned his evidence of past torture in assessing his withholding claim, the BIA ignored it altogether in addressing his CAT claim. He argues this is a legal error because 8 C.F.R. § 1208.16(c)(3)(i) requires the agency to consider evidence of past torture. *See* Pet'r's Opening Br. at 32, 33-34.

In *Sidabutar*, 503 F.3d at 1122, we held the petitioners' contentions challenging "the BIA's allegedly de novo [fact]finding" in contravention of 8 C.F.R. § 1003.1(d)(3)(1) "should have been brought before the BIA in the first instance through a motion to reconsider or reopen." *Id.*; *see also id.* at 1122 n.6. Likewise, Mr. Simpara's argument that that BIA failed to follow its own regulation—here, 8 C.F.R. §1208.16 (c)(3)(i)—in assessing his CAT claim should have been brought in a motion to reconsider. Because the BIA had no opportunity to consider the merits of this claim, it is unexhausted and we lack jurisdiction to consider it. *See id.* at 1122.

c. *Aggregate Risks*

Mr. Simpara contends that, by not considering whether he will be tortured by non-family members, the BIA necessarily failed to aggregate the risks of torture presented by all entities he fears. *See* Pet'r's Opening Br. at 35. But Mr. Simpara

28

did not raise a failure-to-aggregate argument in his BIA appeal.  And to the extent this contention is based on the BIA's failure to consider evidence of a likelihood of torture by non-family members, it is unexhausted as previously explained.

    d.  *Family's Use of Government Resources*

The BIA agreed with the IJ's finding that Mr. Simpara provided insufficient evidence that his family would be able to find and harm him using government resources.  Mr. Simpara argues the agency ignored ample evidence in making this finding.  *See* Pet'r's Opening Br. at 32-33.  He exhausted this argument in his BIA appeal.  *See* Admin. R. at 36-37.  He points to evidence of his family's relationship with a Malian general and to his increased fear of harm following the 2020 coup in Mali based upon that relationship.  *See* Pet'r's Opening Br. at 32.  Mr. Simpara contends that the BIA "had no basis for its conclusion that [his] family will not harm him using government resources."  *Id.* at 33.  Thus, he argues that the BIA ignored evidence and that its finding is not supported by substantial evidence.  We disagree.

The BIA acknowledged Mr. Simpara's contention that "because his family has connections with the Malian military, the [2020] coup in Mali has military connections, and the Malian government is in a state of crisis, he will more likely be tortured by his family and others with the acquiescence of the government."  Admin. R. at 5.  But the BIA agreed with the IJ that the evidence was insufficient to show that Mr. Simpara's family would be able to find him using government resources.  In particular, even assuming his family was well-connected to the prior regime, the BIA

29

concluded that "in light of the recent coup and the subsequent turmoil and violence, there is insufficient evidence that his family has a continued relationship with the government currently in place." *Id.* Mr. Simpara argues that, because the 2020 coup was a military coup, the evidence shows his family became even more connected to the government through its relationship with the general. Even if such an inference could be drawn, we are not persuaded that the record compels it, as required by § 1252(b)(4)(B), particularly in the absence of evidence regarding the general's role in the coup and the post-coup government in Mali.

3. **Did the BIA Otherwise Err in Affirming the IJ's Denial of Withholding of Removal?**

On his withholding of removal claim, Mr. Simpara challenges the BIA's affirmance of the IJ's determination that he failed to demonstrate past persecution on account of a protected ground. "To establish . . . past persecution, an applicant must show: (1) an incident, or incidents, that rise to the level of persecution; (2) that is on account of one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either unable or unwilling to control." *Orellana-Recinos*, 993 F.3d at 854 (brackets and quotations omitted). An applicant who demonstrates past persecution establishes a rebuttable presumption that his life or freedom would be threatened in the future in the country of removal. *See* 8 C.F.R. § 1208.16(b)(1)(i).

Mr. Simpara contends the whippings he received from family members as a child constituted past persecution on account of his religion.  The BIA upheld the IJ's contrary determination:

> We affirm the Immigration Judge's determination that the respondent did not demonstrate past persecution on account of a protected ground.  The respondent testified that, as a child, he was held down and whipped on one occasion because he snuck out of his house.  He further testified to other instances of being whipped as a form of punishment. We note the respondent concedes that an incident where he was punished by his father and uncle, was as a result of his sneaking out of the house to visit a friend.
>
> Contrary to the respondent's appellate arguments, we discern no clear error in the Immigration Judge's finding that the family's motivation for punishing him was an attempt to discipline him, rather than to harm him on account of a protected ground.

Admin. R. at 4 (citations omitted).

Mr. Simpara argues (a) that the BIA applied the wrong standard of review to the IJ's determination; (b) in deciding that the whippings were motivated solely by an attempt to discipline him, the BIA failed to consider whether his family members had mixed motives that included his religion; and (c) if the BIA did not legally err, substantial evidence does not support the BIA's determination.  *See* Pet'r's Opening Br. at 36-41.  He exhausted these arguments before the agency.  *See* Admin. R. at 38-41.[8]

---

[8] Mr. Simpara argues the BIA erred by reviewing the IJ's no-past-persecution determination under the clear error standard rather than de novo.  *See* Pet'r's Opening Br. at 38-39.  Mr. Simpara exhausted this issue because he asserted in his BIA

a. *BIA's standard of review*

The IJ concluded that the family's motivation for whipping Mr. Simpara was to discipline him rather than to harm him on account of a protected ground. He argues the BIA legally erred by reviewing that determination for clear error instead of de novo. We review this claim of legal error de novo. *See Xue v. Lynch*, 846 F.3d 1099, 1106 (10th Cir. 2017) ("The failure of the BIA to apply the correct standard of review on appeal from the decision of an IJ is, itself, a legal error requiring remand for additional proceedings.").

The BIA's standards for reviewing an IJ's decision are set forth in 8 C.F.R. § 1003.1(d)(3)(i)-(ii):

> (3) Scope of Review.
>
> (i) The Board will not engage in de novo review of findings of fact determined by an immigration judge. Facts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous.
>
> (ii) The Board may review questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges de novo.

The BIA stated it applied these standards. *See* Admin. R. at 3. But Mr. Simpara disagrees as to the IJ's past-persecution determination.

---

appeal, citing 8 C.F.R. § 1003.1(d)(3)(ii), that the BIA should review de novo the IJ's determination that his childhood whippings were not on account of his religion because the family's motive was disciplinary. *See* Admin. R. at 39-40.

Mr. Simpara points to the BIA's construction of § 1003.1(d)(3)(i)-(ii) in

*Matter of A-S-B-*, 24 I. & N. Dec. 493, 496-97 (B.I.A. 2008), *overruled on other*

*grounds*, *Matter of Z-Z-O-*, 26 I. & N. Dec. 586, 590 (B.I.A. 2015).[9]  The BIA held

that "[t]he clearly erroneous standard . . . does not apply to the application of legal

standards, such as whether the facts established by an alien amount to past

persecution" because "the Board is better positioned to resolve issues involving the

application of legal standards."  *Id.* at 496 (quotations omitted).  In citing a "specific

example[]," the BIA stated that whether "the harm was inflicted on account of a

protected ground" is a "question[] that will not be limited by the clearly erroneous

standard."  *Id.* at 497 (quotations omitted).  Based upon this stated example,

Mr. Simpara argues the BIA erred by not reviewing de novo the IJ's determination

that his childhood whippings were not on account of a protected ground.  *See* Pet'r's

Opening Br. at 38-39.

The government responds that the BIA consistently reviews an IJ's factual

findings regarding a persecutor's motivation for clear error.  *See* Resp. Br. at 36-37.

*See, e.g.*, *Matter of M-A-M-Z-*, 28 I. & N. Dec. 173, 176 (B.I.A. 2020) ("An

---

[9] The government asserts that *Matter of A-S-B-* was entirely overruled in *Matter of Z-Z-O-*.  But we concluded in *Xue* that *Matter of Z-Z-O-* overruled only that portion of *Matter of A-S-B-* "treating as an issue of law an IJ's predictions as to what events were likely to happen in the future," leaving in place the portion of that decision "which empowered the agency to review de novo an IJ's determination as to whether a given set of facts amounts to persecution."  846 F.3d at 1105 n.9. Mr. Simpara does not rely on the overruled portion of *Matter of A-S-B-*.

Immigration Judge's finding regarding the motive of the persecutor is a factual issue that is reviewed for clear error."); *Matter of N-M-*, 25 I. & N. Dec. 526, 532 (B.I.A. 2011) ("A persecutor's actual motive is a matter of fact to be determined by the Immigration Judge and reviewed by us for clear error."); *In re J-B-N- & S-M-*, 24 I. & N. Dec. 208, 214-15 (B.I.A. 2007) (noting "[t]he motivation of the persecutors involves questions of fact" and holding the IJ's relevant fact-finding was not clearly erroneous).

We see no conflict in the cited BIA decisions. *Matter of A-S-B-* did not hold that the BIA reviews de novo the factual findings underlying an IJ's decision whether persecution was on account of a protected ground. Rather, de novo review applies only to "whether the facts established by an alien amount to past persecution," including application of the legal "on account of a protected ground" standard to those facts. *Matter of A-S-B-*, 24 I. & N. Dec. at 496-97 (quotations omitted); *see also Xue*, 846 F.3d at 1104 (noting the BIA reviews de novo the "question of law" "whether a given set of facts amount to persecution").[10]

The foregoing is consistent with the BIA cases cited by the government holding that a persecutor's motivation is a question of fact reviewed for clear error.

---

[10] Unlike the BIA, this court has held "that the ultimate determination whether an alien has demonstrated persecution is a question of fact, even if the underlying factual circumstances are not in dispute and the only issue is whether those circumstances qualify as persecution." *Xue*, 846 F.3d at 1104 (quotations omitted).

34

In *Xue*, we recognized that the persecution question may turn on disputed facts or on "the ultimate question of whether a given set of facts amounted to persecution." 846 F.3d at 1106 n.11; *see also Matter of M-F-O-*, 28 I. & N. Dec. 408, 411-12 (B.I.A. 2021) (concluding the IJ did not clearly err in finding that gang members targeted the alien "because they wanted him to join their ranks" and holding that "motivation[ did] not constitute persecution on account of any valid protected ground" (quotations omitted)).

We conclude that the BIA did not err in reviewing for clear error the IJ's finding regarding the family's motivation for whipping Mr. Simpara as a child. And in light of the BIA's conclusion that the IJ's finding was not clearly erroneous, we are not persuaded that the BIA then failed to review de novo the IJ's ultimate determination that Mr. Simpara did not demonstrate persecution on account of a protected ground. *See* Admin. R. at 3 ("We review . . . issues of law . . . under a de novo standard").

b. *Mixed motives for past persecution*

Mr. Simpara argues that the BIA legally erred by assuming that childhood whippings based on disciplinary motivations could not also be based on religion. He maintains that the BIA's decision disregarded that (1) a persecutor may have mixed motives, and (2) a protected ground need only be one central reason for the persecution. *See* Pet'r's Opening Br. at 39-40 (citing *Dallakoti v. Holder*, 619 F.3d 1264, 1268 (10th Cir. 2010) (holding in a mixed-motive asylum case that "one

35

central reason" for the persecution means that the protected ground "cannot be incidental, tangential, superficial, or subordinate to another reason for harm" (quotations omitted))).  But Mr. Simpara provides no basis for this argument.  In his BIA appeal he argued that the IJ ignored the law regarding mixed motives and the evidence establishing that his persecutors were motivated, at least in part, by several protected grounds.  *See* Admin. R. at 40.  The BIA's affirmance in the face of these arguments shows that Mr. Simpara has not demonstrated legal error by the BIA.

c.  *Substantial evidence*

Finally, Mr. Simpara argues that substantial evidence does not support the BIA's determination that his childhood whippings were motivated by his family's desire to discipline him rather than to harm him on account of a protected ground.  To show error in the BIA's decision, he must demonstrate that "any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B).[11]  Even were we to disagree with the BIA's conclusion, that alone would be an insufficient basis to reverse.  *See Htun*, 818 F.3d at 1119.

---

[11] We have noted the disagreement between this court and the BIA as to the nature of the ultimate determination whether a noncitizen has demonstrated persecution and the applicable standard of review.  *See Xue*, 846 F.3d at 1104-06. But we need not address that disagreement here because Mr. Simpara does not challenge our application of the substantial evidence standard to this issue in his petition for review.

36

Mr. Simpara contends, and the government does not dispute, that parental abuse can be on account of religion. *See In re S-A-*, 22 I. & N. Dec. 1328, 1329-31, 1335-36 (B.I.A. 2000). But the question is whether Mr. Simpara's religious beliefs, not the family's, motivated the punishment. *See id.* at 1329, 1336 (concluding a father's physical and emotional abuse of his daughter, which "arose primarily out of religious differences," specifically "the father's orthodox Muslim beliefs" versus "her liberal Muslim views," constituted past persecution "on account of [the daughter's] religious beliefs, as they differed from those of her father concerning the proper role of women in Moroccan society"); *cf. INS v. Elias-Zacarias*, 502 U.S. 478, 482 (1992) ("The ordinary meaning of the phrase persecution on account of political opinion is persecution on account of the *victim's* political opinion, not the persecutor's." (ellipsis and quotations omitted)).

Mr. Simpara argues the evidence establishes such a motive. *See* Pet'r's Opening Br. at 36-37, 40-41. He cites his testimony that he was "punished by the men in [his] family for breaking the laws of Islam and the laws of [his] family" when his father and uncle whipped him for sneaking out of his house to visit a friend. Admin. R. at 365; *see also id.* at 569 (citing leaving the house after returning from school as an example of violating his family's "very strict" customs "according to the Koran" that would result in punishment); *id.* at 570 (describing being whipped by his uncle for watching pornography, which is "forbidden").

37

Mr. Simpara contends these whippings were attempts to discipline him on account of his insufficient adherence to Islam. *See* Pet'r's Opening Br. at 40. He also points to evidence that adults in his family are also commonly whipped as a punishment for violating Sharia law, which he says supports the conclusion that he was disciplined at least in part based on religious transgressions. *See id.* Mr. Simpara asserts that, absent evidence that disciplinary and religious motives cannot coexist, there is no evidentiary basis for the BIA's determination that his childhood whippings were not on account of his religion.

The government counters that a reasonable adjudicator could find that the family's sole motivation was discipline. They punished him as a child, at his home, and without the religious ritual, for common childhood misbehaviors such as sneaking out of the house, skipping school, and watching pornography.

In reply, Mr. Simpara asserts that evidence of religious punishments at the mosque does not preclude that punishments at home were religiously motivated. And he contends that his uncle, the provincial religious leader, was "summoned" to whip him, which he says strongly suggests that his punishments "were more than mere efforts at parental discipline." Pet'r's Reply Br. at 19.[12] Finally, Mr. Simpara states

---

[12] Mr. Simpara testified that his uncle was the head of the multi-family household in Mali. *See* Admin. R. at 351-53.

that his expert's report equated family and religious discipline.[13] He concludes that his family whipped him based upon religious norms and codes prohibiting his actions and permitting drastic punishments, and there is thus no basis to rule out a religious motive.

"[W]e cannot reverse the determination of the BIA unless the record compels us to conclude that it was wrong." *Neri-Garcia v. Holder*, 696 F.3d 1003, 1008 (10th Cir. 2012) (quotations omitted). Even if a conclusion *could* be drawn that Mr. Simpara's childhood whippings were on account of his religious beliefs and not solely motivated by a parental attempt to discipline, we cannot reweigh the evidence, and we are not persuaded that the evidence *compels* that conclusion. *See, e.g.*, *Escobar-Hernandez v. Barr*, 940 F.3d 1358, 1361 (10th Cir. 2019) (holding petitioner failed to demonstrate that any reasonable adjudicator would be compelled to conclude, contrary to the IJ's finding, that a past assault resulted from a personal disagreement unrelated to the petitioner's political opinion).

---

[13] Mr. Simpara cites a page of the expert report, Admin. R. at 594, without specifying a particular statement to this effect.

4. **Did the BIA Err in Denying the Motion to Remand?**

Along with his BIA appeal, Mr. Simpara filed a motion to remand to the IJ, arguing changed country conditions in Mali after the date of his IJ hearing. He contends the BIA abused its discretion in denying that motion.

We review the BIA's denial of a motion to remand for an abuse of discretion. *See Witjaksono v. Holder*, 573 F.3d 968, 978-79 (10th Cir. 2009). "The BIA abuses its discretion when its decision provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements." *Qiu v. Sessions*, 870 F.3d 1200, 1202 (10th Cir. 2017) (quotations omitted). The BIA also necessarily abuses its discretion by "committing a legal error or making a factual finding that is not supported by substantial record evidence." *Id.* (brackets and quotations omitted).

The BIA may deny a motion to remand when the movant either failed to introduce new material evidence or did not establish a prima facie case for the relief sought. *See Mickeviciute v. INS*, 327 F.3d 1159, 1162 (10th Cir. 2003). Ultimately, the movant must present new evidence that will likely change the result in his case. *See Maatougui v. Holder*, 738 F.3d 1230, 1240 (10th Cir. 2013). Such motions are

"plainly disfavored," and the movant "bears a heavy burden to show the BIA abused its discretion." *Id.* at 1239 (brackets and quotations omitted).[14]

Mr. Simpara attached to his motion to remand an addendum expert report and news articles concerning a military coup in Mali in 2021. The BIA found this evidence was new and not previously available. But noting that Mr. Simpara had submitted expert evidence regarding the previous military coup in 2020 that occurred before his IJ hearing, the BIA concluded his new evidence "reflects conditions that are substantially similar to those that existed at the time of [his] hearing." It stated further that

> [w]hile [he] proffered evidence of a subsequent coup in May 2021 in Mali, the political instability in Mali had already existed at the time of the initial hearing, and thus does not reflect a change in country conditions, and appears to be a continuation of the same situation as when [he] previously testified."

Admin. R. at 6.

The BIA separately concluded that Mr. Simpara's new evidence did not establish his prima facie eligibility for relief or otherwise affect the outcome of his case because it failed to address how the 2021 coup affected his contention that his family is sufficiently well-connected to the government of Mali to be able to use its resources to harm him. And to the extent the new evidence related to jihadist groups

---

[14] Our decisions in *Mickeviciute* and *Maatougui* involved motions to reopen, but "[t]he BIA applies the same legal standard to motions to reopen and motions to remand." *Witjaksono*, 573 F.3d at 979 n.10.

41

in Mali, the BIA concluded it failed to demonstrate a clear probability of persecution because Mr. Simpara previously testified that his family does not condone jihadist groups.

Mr. Simpara argues the BIA abused its discretion in assessing both his prima facie eligibility for relief and the materiality of his evidence. Because the BIA's analysis regarding his prima facie case focused solely on his risk of harm from his family—specifically on (1) a lack of evidence of his family's ability, after the 2021 coup, to harm him using government resources; and (2) their disapproval of jihadist groups—Mr. Simpara argues the BIA ignored the evidence showing that the government and Islamist groups are likely to harm him even without his family's involvement, support, or approval.

The government responds that the BIA's focus on a risk of harm by Mr. Simpara's family was consistent with the arguments in his motion to remand, which characterized the threat from the Malian government and jihadists following the 2021 coup as increasing the likelihood his family could and would harm him. But Mr. Simpara's motion was not so limited. Although he argued that jihadists would influence his family and that he was at an increased risk of being persecuted or tortured by his family, he also contended that the new military government (including state security forces), and intolerant Islamist members of Malian society would

42

threaten his life.[15]  Thus, we agree with Mr. Simpara that, in assessing whether he demonstrated prima facie eligibility for relief, the BIA failed to address his claims of an increased risk, following the 2021 coup, of persecution and torture by these non-family members.

But the BIA also separately concluded that Mr. Simpara's new evidence was not material because it did not demonstrate a change in country conditions in Mali after his IJ hearing.  Challenging this finding, Mr. Simpara first argues that the BIA's conclusion was too summary and conclusory.  We are not persuaded.  "The BIA is not required to write an exegesis on every contention.  What is required is that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Maatougui*, 738 F.3d at 1242-43 (brackets and quotations omitted).  Although the BIA's decision on this issue is "succinct," it shows that the BIA considered the issues raised and is "sufficient for meaningful appellate review."  *Id.*

Mr. Simpara argues further he should be able to show that a change in country conditions had increased the risk of persecution even when there had already been

---

[15] *See* Admin. R. at 50 (stating "he fears both the government and his family," both of which "are encouraged by Islamist militants to treat people like Mr. Simpara with deadly violence"; *id.* (noting "Malians in government and in society are likely to become more intolerant of people like Mr. Simpara"); *id.* (stating he fears both "his family and members of Malian society" because of the popularity of the new pro-Islamist government); *id.* at 51 (noting an increased risk of harm by hardline Islamist members of society, including his family, and by state security forces).

some level of persecution.  *See Qiu*, 870 F.3d at 1204 (rejecting BIA's reasoning that a substantial increase in religious persecution was irrelevant because China had long repressed religious freedom).  But the BIA did not preclude him from making such a showing.  It held his new evidence failed to do so.

Finally, again citing *Qiu*, Mr. Simpara contends that the BIA did not adequately address significant evidence that he submitted.  We held in *Qiu* that "the BIA abused its discretion by denying the motion [to reopen] on factually erroneous, legally frivolous, and logically unsound grounds."  870 F.3d at 1206.  But *Qiu* is distinguishable.  We concluded there that the BIA disregarded uncontradicted evidence "of a 300 percent increase in the persecution of Christians [in China], unprecedented violations of religious freedoms beginning in 2014 [three years after the IJ hearing], and possibly the most egregious and persistent wave of persecution against Christians since the Cultural Revolution of 1966-76."  *Id.* at 1204 (quotations omitted).  In contrast, Mr. Simpara's evidence consisted of predictions, less than a month after the second coup, of what may occur in its aftermath.  Moreover, as the government notes, there is evidence supporting the BIA's conclusion that Mr. Simpara's new evidence showed a continuation of substantially similar political instability in Mali rather than materially changed country conditions.  *See* Resp. Br. at 48-49 (noting evidence that the same colonel had led both coups and had wielded power even before the May 2021 coup).  Thus, Mr. Simpara fails to demonstrate that the BIA's factual finding regarding materiality "is not supported by substantial

44

record evidence," *Qiu*, 870 F.3d at 1202 (quotations omitted).  He has not shown that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

## III. **CONCLUSION**

We dismiss in part and deny in part Mr. Simpara's petition for review.  We grant Mr. Simpara's motion to proceed in his petition for review without prepayment of appellate costs and fees.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge

45